UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                               )
UNITED STATES OF AMERICA       )
                               )
         v.                    )      CRIM. NO. 18-10092-WGY
                               )
RYAN S. LIN                    )
_____)
```

### DEFENDANT'S SENTENCING MEMORANDUM

The defendant, Ryan Lin, submits this memorandum to assist the Court in determining an appropriate sentence in this case. The defendant requests that this Court impose a sentence of 84 months incarceration with 60 months of supervised release. This sentence is sufficient, but not greater than necessary, to comply with the purposes enunciated by Congress in 18 U.S.C. § 3553(a).

### Ryan Lin's Background

Ryan Lin is 25 years old. He was born in Fuzhou, China in 1992, and was raised by his paternal grandparents until he was three, while his parents obtained their graduate degrees in the United States. In 1996, he joined his parents stateside, and at age 15, he became a United States citizen, one of the proudest memories of his young life. Ryan's first words were in Chinese, but he no longer speaks it and learned English while in school. He has a younger sister, Reyna Lin.

Ryan had some developmental issues as an infant, including issues chewing and eating until he was five. In a letter to the Court, Ryan's mother, Songlin Mo, states that around kindergarten, she noticed Ryan had "social problems" after he was assigned to the front seat of the bus because he had thrown papers in response to humidity on the bus.[1] Probation reported that in their interview with Songlin, "she was concerned about his anti-social behaviors, noting that he always struggled in school and never had friends."[2]

While attending schools in New Haven and North Branford, Connecticut, Ryan received generally good grades. However, at times, his behavior in school merited discipline, up to and including suspension, a reflection of what would become "a long and documented history of  . . . odd behavior, including impaired interpersonal interactions, difficulty with reasoning, and demonstrating illogical behaviors."[3] Some of his teachers noted Ryan needed to improve his listening skills and self-discipline, while others noted he was an absolute pleasure to have as a student.[4]

---

[1] Exhibit A, Letter from Songlin Mo and Sean Lin (Ryan Lin's Parents).
[2] PSR, pg. 43.
[3] Exhibit B, Dr. Mendoza report (evaluation).
[4] Exhibit C, School Records.

In middle school, Ryan was suspended twice for making sexually inappropriate gestures with a wooden pole.[5] He was also suspended after he falsely claimed one of his peers was pregnant and that he had seen another naked, and another time for sending an inappropriate message to a female student.[6] Overall, he received 6 formal suspensions while at North Branford Intermediate.[7] Still, Ryan was a bright student, teaching himself computer coding as a seventh grader.[8] In response to these incidents, Ryan was referred to a mental health provider who concluded, "Ryan has his own rules and doesn't follow social rules." As his mother states in her letter, the Lin family was not able to continue with therapy because Ryan's father developed end stage kidney failure that required years of intensive dialysis. She fears this hard choice turned out to be "the biggest mistake of [her] life."[9]

In high school, Ryan would harass other students, hacking into Facebook profiles of classmates and posting negative comments about them.[10] However, he graduated on time, pursued

---

[5] Exhibit C, School Records.
[6] Exhibit C, School Records.
[7] Exhibit C, School Records; he relayed to Dr. Mendoza that he may have received as many as 20 suspensions, including in-school suspensions which were not a part of the school records counsel received.
[8] Exhibit B, Dr. Mendoza report (evaluation).
[9] Exhibit A, Letter from Songlin Mo and Sean Lin (Ryan Lin's Parents).
[10] Exhibit B, Dr. Mendoza report (evaluation).

higher education, and his little sister Reyna notes in her letter that he was always available to help her with her computer science homework, pick her up from school when she was sick, or make sure she was eating.[11]

Ryan attended Carnegie Mellon University to study computer engineering. He had a conflict with his roommate while there and ultimately dropped out after three semesters. He attended Hudson Valley Community College, and then later, Rensselaer Polytechnic Institute (RPI). While at RPI, he was the web master for the International Chinese Study Association. At first, he was quite popular with the group because of his computer skills, but after a perceived slight, Ryan decided to delete the group's entire website. He graduated from RPI in 2015 with a degree in computer science, magna cum laude, with a 3.8 cumulative GPA.

While Ryan is close with his family, he has very few friends, a reflection of his lifelong struggle with the interpersonal relationships that are reflective of a healthy emotional life. He has not maintained any friendships from any of his schooling, and moreover, the relationships he did have were marked by harassment. He has never had a romantic relationship. His younger sister, Reyna, noted that he was especially awkward with girls and women, and that he would "step

---

[11] Exhibit D, Letter from Reyna Lin.

4

on people's toes to annoy them."[12] His parents also recall times where Ryan would talk to himself, or exhibit strange tics, including random spasms of his hands or eyes.[13] Other than his computer, Ryan has never held a hobby, other passion, or interest.

After college, Ryan moved to Boston, holding exclusively software development positions. Although this field is one where his interests and skill set lie, he had trouble keeping a job, because of his odd behavior that anyone would recognize as counterproductive to career success. He had issues focusing and paying attention, bristled against supervisors, and problems in interpersonal relations, as well as issues communicating and socializing and as a result, performed his work poorly.

Ryan's interpersonal struggles were not confined to the workplace. As detailed in his own letters to the Court, these struggles only increased when he moved to Boston, away from his family, his sole source of support, to pursue his career. He experienced difficulties with his roommates on a consistent basis, regardless of where he was living. Ryan would run up and down the stairs of the apartment; leave the water running in the sinks; turn on all the lights and fans without reason; fill up kitchen bottles and cans with oil, water, sugar, salt, detergent

---

[12] Exhibit B, Dr. Mendoza report (evaluation).
[13] Exhibit B, Dr. Mendoza report (evaluation).

and hand sanitizer and place them around the apartment; smear yogurt around the living room;[14] and hid bags of garbage and spoiled food in the closet.[15] When confronted about these incidents, he would deny his role, or state that he had no recollection of his odd behavior. As time went on, Ryan's behavior worsened to the point that even he realized something was wrong, and Ryan unsuccessfully sought professional help for his problems. One therapist declined to accept Ryan as a patient because he did not have the requisite experience in Autism Spectrum Disorders and therefore could not provide Ryan with the treatment he desperately needed.[16]

### Ryan's Mental Health Evaluation and Diagnosis

Dr. Robert Mendoza, Psy. D. evaluated Ryan at Wyatt Detention Center ("Wyatt"), where he is being held pursuant to these charges. He found, after reviewing Ryan's medical and school records, and speaking with the Lin family, that "there is substantial data to support the diagnostic criteria set forth in the [DSM-5] for Autism Spectrum Disorder Overall Between Severity Level 1 and 2." [17] He found that Ryan demonstrates:

- Persistent deficits in social communication and social interaction;

---

[14] ECF No. 4, "Criminal Complaint," pg. 7, ¶ 17.
[15] Exhibit B, Dr. Mendoza report (evaluation).
[16] Exhibit B, Dr. Mendoza report (evaluation).
[17] Exhibit B, Dr. Mendoza report (evaluation)at pg. 9.

- Significant deficit interpreting nonverbal and verbal social cues; and

- Abnormally high focus and intensity on restrictive and repetitive behaviors related to specialized interests, and distress when aspects of his life do not remain precisely the same.

Dr. Mendoza also found that these behaviors were present in Ryan's early development and have persisted throughout his life. Ryan's symptoms "have led to clinically significant impairment in multiple aspects of his life including social engagements, occupational pursuits, and day-to-day functioning including relationships with housemates."[18]

Ryan's Autism Spectrum Disorder and resultant poor interpersonal skills make him more than just a disagreeable person and directly weigh on the charges of criminal conduct before this Court. Again, according to Dr. Mendoza, "an odd, illogical, inflexible, obsessive, compulsive, and self-destructive pattern of thought behavior appears to have motivated Mr. Lin to engage in using technology for socially inappropriate and disruptive purposes."[19] As counterintuitive as it may seem, Ryan used a pattern of illogical harassment as a way to understand others, "to engage that person and to learn

---

[18] Exhibit B, Dr. Mendoza report (evaluation) at pg. 9.
[19] Exhibit B, Dr. Mendoza report (evaluation) at pg. 10.

more about them."[20] Even when he recognizes the irrational nature

of such an approach, Ryan cannot help himself, lacking the self-

regulation to stop and finding comfort in repetition, even as

that repetition resulted in escalated harm to his victims. In

fact, this type of repetitive, obsessive and unrelenting

behavior in the face of known consequences, is, according to Dr.

Mendoza, consistent for individuals with Autism Spectrum

Disorder. As Dr. Mendoza points out:

> Mr. Lin has spent a lifetime being ignored by others,
> bullied by some, and most likely marginalized in
> whatever educational or vocational setting that he was
> in. Mr. Lin understood at an early age that he could
> use computers to reach others in ways that he couldn't
> otherwise. While he saw the consequences of these
> engagements as potentially negative . . . it was still
> the only way to have others begin a discussion with
> him. The extent of the reaction from others, as well
> the consequences, was less relevant to him than having
> someone not respond to him at all.[21]

Ryan has been incarcerated at Wyatt since his arrest and

his odd behaviors have continued, as one would expect without

adequate treatment for his condition. As recently as May 2018,

officials noted that there were loud noises coming from Ryan's

cell and discovered he was punching himself in the face, because

he was "bored."[22] There are several reports of this type of self-

injurious behavior which is common for those with Autism

Spectrum Disorder and other developmental disabilities – in a

---

[20] Exhibit B, Dr. Mendoza report (evaluation) at pg. 10.
[21] Exhibit B, Dr. Mendoza report (evaluation) at pg. 11.
[22] Exhibit E, Wyatt Medical Records.

study of over 8,000 children with Autism Spectrum Disorder, over one in four (28%) were found to engage in banging of the head, poking their own eyes, pulling their own hair, or biting, hitting and pinching themselves.[23] According to Probation, in December 2017, the defendant was referred to mental health services at Wyatt and diagnosed by the institution with Asperger's Syndrome and anxiety.[24]

In the Government's submission regarding Supplemental Offense Conduct, they state that they received information from an anonymous informant detainee that Ryan was injuring himself in order to bolster his "autism defense." As discussed *infra*, this unidentified source of information is not credible, and all of his statements should be summarily disregarded by this Court. Further, it borders on obscene, and a violation of the Government's duty not to discriminate against those with disabilities, to accuse Ryan of "faking" his Autism Spectrum Disorder; any reasonable party, including the Government itself, must admit that Ryan's behavior leading up and during the criminal conduct was strange and indicative of someone with a very real mental health problem. There is no reason to doubt the

---

[23] Soke, Gnakaub N, et al., *Prevalence of Self-Injurious Behaviors Among Children with Autism Spectrum Disorder – A Population-Based Study*, 11 J. AUTISM DEV. DISORD. 46 (Nov. 2016).

[24] Presentence Investigation Report. Asperger's was in the DSM-IV but removed from the DSM-V and replaced with diagnosis of autism spectrum disorder, as Dr. Mendoza uses in his report.

credibility of Dr. Mendoza or the doctors at Wyatt (federal employees), who both came to the conclusion that Ryan is indeed autistic. The only reason Ryan engaged in any of this behavior was because of his mental health condition, and the allegations of the Government's anonymous informant are not enough to dispute this fact.

## An Appropriate Sentence

This case is before the Court following the defendant's guilty plea to an Information charging him with seven counts of cyber stalking in violation of 18 U.S.C. § 2261A(2)(B); five counts of distribution of child pornography in violation of 18 U.S.C. § 2252(a)(2); nine counts of hoax bomb threats in violation of 18 U.S.C. § 844(e); three counts of computer fraud and abuse in violation of 18 U.S.C. §§ 1030(a)(2)(C) and (c)(2)(B); and one count of aggravated identity theft in violation of 18 U.S.C. § 1028A. Ryan understands that, post-incarceration, he will be required to register as a sex offender, and that failure to do so could subject him to new criminal charges pursuant to 18 U.S.C. § 2250. Further, the parties, pursuant to Rule 11(c)(1)(C) have agreed to: incarceration for 84-210 months; a fine within the guidelines, unless Ryan is unable to pay; 60 months of supervised release; $2,500 special assessment; and restitution as determined by the Court. Probation reviewed Ryan's finances and confirms he does

not have an ability to pay and no restitution claims have been made to date.[25] Therefore he requests that no other fines, fees or restitution be imposed in excess of the $2,500 mandatory special assessment.

Given the outsized impact that his undiagnosed Autism Spectrum Disorder has on Ryan's criminal conduct, the defendant requests that this Court adopt his sentencing recommendation of 84 months and 60 months of supervised release, which is within the range the parties have agreed is "a reasonable and appropriate disposition of this case."[26] Although this is below the guideline range, it is consistent with other below-guideline sentences for similar conduct issued by this Court and other judges in this district, discussed *infra*, and is a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in 17 U.S.C. § 3553(a)(2). Further, it is the mandatory minimum sentence set by the child pornography and aggravated identity theft offenses, the latter which must be served consecutively.

As the Court appreciates, the advisory guideline sentencing range is the "starting point and the initial benchmark" but it is not the only consideration in the sentencing analysis. *Gall v. United States*, 552 U.S. 38, 49 (2007). There is no

---

[25] PSR, pgs. 48 and 50, ¶ 238-241, and 258.
[26] March 30, 2018 Change of Plea Agreement, ECF No. 31, pg. 6.

presumption that a guideline range is reasonable. *Id.* at 50. The
Court must ultimately "make an individualized assessment based
on the facts presented." *Id.* The Court conducts a case-by-case
analysis, "the hallmark of which is flexibility." *United States
v. Martin*, 520 F.3d 87, 91 (1st Cir. 2008). The overarching goal
is to "consider every convicted person as an individual and
every case as a unique study in the human failings that
sometimes mitigate, sometimes magnify, the crime and the
punishment to ensue." *Id.* quoting *Gall*, 552 U.S. at 52.

Ryan understands that what he did was wrong, and he is
ashamed to let down his parents who worked so hard to make a
better life for him in this country. He understands he must be
held accountable for all of his conduct, but seeks proportionate
punishment which takes into account the medical mitigating
factors present in his case. He asks that this Court consider
his conduct in light of his undiagnosed condition; a condition
he did seek help for, but was ultimately unsuccessful in
treating on his own.

### The Nature and Circumstances of the Offense

Ryan's crime is unlike that of other defendants in the
federal system. This is because, tragically, Ryan has been
struggling with an undiagnosed developmental disorder for his
entire life. As research in this field shows, there is a
connection between those, who like Ryan, have a deficit of

12

interpersonal skills or an ability to respond to social constraints on their behavior, and criminal behavior.[27] Research in Autism Spectrum Disorder and Asperger's suggests that four factors predispose individuals with Autism Spectrum Disorder to commit crimes, including social naiveté, aggression triggered by disrupted routine, aggression due to social misunderstanding, and obsessive behavior with a lack of understanding of the implications of that behavior.[28] Additionally, lack of empathy, an inability to consistently control emotions, and issues associated with "moral reasoning" can increase the exposure within the criminal justice system for individuals with Autism Spectrum Disorder.[29] All of these factors played a role in Ryan's conduct and it is only through the lens of this disorder that we can adequately evaluate his behavior. "Individuals with deficits in central coherence may engage in criminal behavior because of their excessive preoccupation with highly focused internal interests, while ignoring social consequences, including legal sanctions."[30]

---

[27] Barbara Haskins and J. Arturo Silva, *Asperger's Disorder and Criminal Behavior: Forensic-Psychiatric Considerations*, J. Am. Acad. Psych. and Law, 34 (2006).

[28] Howlin P, Autism: Preparing for Adulthood (2nd Ed. 2004).

[29] King C and Murphy GH, "A Systematic Review of People with Autism Spectrum Disorders and Criminal Justice System", J. AUTISM & DEV. DISORDERS (2014).

[30] *Id.*

Indeed, Ryan's behavior continued, even as legal sanctions were, to any reasonable observer, forthcoming. As early as Spring/Summer 2016, Watertown police issued warnings to Lin about his harassing behavior, and on August 1, 2016 a harassment prevention order issued from Waltham District Court against Lin on behalf of one of his roommates, Amanda Johnson.[31] In part of Ryan's diary that was seized, he notes in November 2016 that he is concerned about the police.[32] In January 2017, he treats a threat by Wellesley Police to file a criminal complaint as "obviously a trick."[33] On April 20, 2017 he writes in his seized diary that he has sent out Smith's diary to her contact list and mentions his belief that the police have given up because Ryan would not pick up the phone.[34] In May 2017, Ryan finds out the police have issued a subpoena for one of his email accounts used during the harassment and acknowledges this "is really bad."[35] Even as he had this direct evidence that the police were interested in stopping his behavior and expressed his own internal concerns, Ryan could not stop himself. The harassment he started in April 2016 continued through the time of Ryan's

---

[31] Although the victim's name is known to the parties, an anonymous pseudonym is used for her and all victims throughout, in accordance with the practice established by the Government in their initial pleadings.

[32] Government's Statement of Offense.

[33] *Id.*

[34] PSR, pg. 21.

[35] *Id.*

arrest in October 2017, and mainly focused on another roommate he and Johnson shared the apartment with, Jennifer Smith.[36] Ryan's persistent harassment in spite of increasing police pressure is a direct reflection of his Autism Spectrum Disorder, which is marked by obsessive and compulsive behaviors, and his actions must be evaluated within that context.

From April 2016 through October 2017, Ryan repeatedly accessed many of Smith's online accounts, including her private journal which she kept in an electronic format, as well as her electronic devices. Ryan pretended to be Smith by sending e-mails and messages from her online accounts; obtaining her medical, tax and financial records without her permission or knowledge; posting on sexual fetish websites pretending to be Smith, including her home address, and inviting men to show up for sex, three of whom actually did travel to Smith's home; telling a pet owner client of Smith's that she had killed the pet which prompted a panicked call to police who confronted Smith herself; applying for unemployment on Smith's behalf; cancelling her driver's license registration; filing a bank application; and sending child pornography, again from one of Smith's accounts, to Smith's mother, father, co-workers, and

---

[36] *Supra* Note 26.

friends. As to the child pornography, there were approximately 12 such photos that Ryan possessed and further distributed.[37]

Ryan's harassment of Smith also extended to her family members, who received messages from Ryan that accused Smith's mother of molesting Smith and her brother as children; discussed Smith in a sexual manner; and threatened to rape or kill Smith and her mother. Ryan posed as Smith's mother and her boss in e-mails and on Facebook, and threatened to bring guns to nearby high schools, which also led to police responses; a bomb threat was also made to Maryland police who were dispatched to Smith's mother's home. In all, the Government alleges that Ryan made over a hundred anonymous hoax bomb threats.

Ryan targeted Smith's employer and friends in a similar manner, with threatening and sexual text messages and images. When Ryan moved away from the home he shared with Smith, he continued his harassment with his new housemates. He sent them harassing and threatening text messages that included personal identifying information, indicating their harasser knew where they lived, worked, and had gone to school.

This behavior is abhorrent, to be sure. However, it is also the reflection of a young man with an undiagnosed and dormant

---

[37] Ryan also sent child pornography and threatening communications to two individuals he went to college with; one with whom he was friendly and another whom he did not know personally.

mental health condition. With no understanding or treatment of his Autism Spectrum Disorder, and without an outlet to release his frustrations that came from not understanding those in the world around him, it is not surprising that Ryan lashed out. What is surprising is the extent of the harassment and the period over which it took place; a term of imprisonment of 84 months, is sufficient, but not greater than necessary to punish this behavior. As Dr. Mendoza notes in his report, "While Mr. Lin cognitively understands what it means to bring physical and emotional harm to others, he simply does not have much of the neurology associated with appreciating what that might actually mean on an emotional level."[38] An 84-month sentence punishes him adequately for the conduct he engaged in, while acknowledging the role that an uncontrolled and unknown condition played here.

### Enhancements and Reductions

The Government takes the position that Ryan is subject to a two level enhancement under 2G2.2(b)(3)(F). However, this enhancement is redundant to the conduct charged in the statute as it supplies an enhancement for "knowingly" engaging in distribution, where the statute itself, 18 U.S.C. § 2252(a)(2) already requires that the defendant "knowingly" distribute child pornography. Further, it is clear that Ryan was not distributing the photos in an attempt to perpetuate or participate in the

---

[38] Exhibit B, Dr. Mendoza report (evaluation) at pg. 11.

market for such obscene images, a fact which distinguishes him from others charged with this conduct.

Similarly, where 96.3% of all federal child pornography cases involve the use of a computer enhancement, which the Government also seeks, it is worth considering whether this enhancement is truly a reflection of "Specific Offense Characteristics," as the Sentencing Guidelines refers to it or whether use of a computer is "all but inherent to the crime of conviction" as the Second Circuit described it. *United States v. Dorvee*, 616 F.3d 174, 184-85 (2nd Cir. 2010). That court described the child pornography guidelines as "an eccentric Guideline, of highly unusual provenance which, unless carefully applied, can easily generate unreasonable results" and as "fundamentally incompatible with § 3553(a)." *Id.* at 187-88. Similarly, the Sentencing Commission, in a report to Congress, found that several of the sentencing enhancements, including the computer enhancement, apply in the vast majority of non-production Child Pornography cases, again calling into question whether this enhancement is a specific offense characteristic, or part and parcel to the crime itself.[39] Where there is virtually no way to disseminate child pornography without the

---

[39] *See* U.S. Sent'g Comm'n, *Report to the Congress: Federal Child Pornography Offenses* at 5, 209 (2012)(available at http://www.ussc.gov/Legislative_and_Public_Affairs/Congressional_Testimony_and_Reports/Sex_Offense_Topics/201212_Federal_Child_Pornography_Offenses/index.cfm).

use of a computer, the two-level enhancement should not be applied.

The Government also reserves the right to increase the offense level by four, because Ryan distributed material that portrays sadistic or masochistic conduct, under guideline 2G2.2(b)(4). Only prong (A) of the guideline conceivably applies because the material Ryan distributed did not involve an infant or toddler as required under prong (B); (A) does not apply because the photo the government points to as being sadistic or masochistic[40] does not equate to the plain meaning or case-law interpretations of those words.

The Guidelines do not specify what constitutes "sadistic or masochistic conduct or other depictions of violence." U.S.S.G. §2G2.2(b)(4); *United States v. Hoey*, 508 F. 3d 687, 691 (1st Cir. 2007). Merriam-Webster defines "sadistic" as "taking pleasure in the infliction of pain, punishment, or humiliation on others."[41] As examples, they refer to "a leg . . . sawed off in sections by a *sadistic* surgeon," or "an especially *sadistic* buddy gave me a video of me falling off my skateboard nearly 160

---

[40] Neither the Government nor Probation rely on masochism as grounds for this enhancement; only the word "sadistic" is used to describe the nature of the photographs. *See,* Government's Statement of Offense at pg. 32 and Presentence Investigation Report at pg. 24.

[41] "Sadistic," Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/sadistic, (last accessed Aug. 14, 2018).

times."[42] "An image's portrayal of sadistic conduct includes portrayal of conduct a viewer would likely think is causing pain to a depicted young child." *Hoey*, 508 F.3d at 691.

Although Ryan did send twelve child pornography images, none of them meet this definition. The specific image the Government relies upon for this enhancement is one of a prepubescent female, sitting on a toilet, with a pencil inserted into her vagina. There was no indication that the female is in pain,[43] unlike in *Hoey*, where "the young child's pained expression [was] sufficient to establish that the picture is intended to give the viewer pleasure based on the child's actual or anticipated pain." 508 F.3d at 692; *see also United States v. Cover*, 800 F.3d 275, 280 (6th Cir. 2015) (holding that where there was "no indication that [the female minor] was visibly pained" the enhancement for sadism did not apply). Further, the pencil was inserted eraser tip first, suggesting that the object was being used for its phallic nature and not its potential to inflict pain. The Government paints with too broad a brush when it attempts to increase Ryan's sentence by characterizing this specific photo as sadistic.[44] Probation did not apply this

---

[42] *Id.*

[43] Her facial expression is more accurately described as "bored."

[44] *See* U.S. Sent'g Comm'n, *Report to the Congress: Federal Child Pornography Offenses* at 5, 209 (2012)(available at http://www.ussc.gov/Legislative_and_Public_Affairs/Congressional _Testimony_and_Reports/Sex_Offense_Topics/201212_Federal_Child_P

enhancement because "it does believe that reasonable minds could interpret the application of this guideline either way"[45] and neither should this Court.

The cases that the Government cites in their Supplemental Offense Conduct and Guidelines point to out of circuit cases that have held that different foreign objects were sadistic, where "a highlighter and a handle of a screwdriver" or a "large carrot" were inserted into a young girl's vagina. *United States v. Johnson*, 784 F.3d 1070, 1075 (7th Cir. 2015); *United States v. Parker*, 267 F.3d 839, 847 (8th Cir. 2001). However, these items are different in both length and width, which distinguishes them from the pencil at issue here. Further, the *Parker* court applied the adjustment even where there was no evidence of pain, contrary to the First Circuit's holding that pain or anticipated pain is what makes the image sadistic. *Hoey*, 508 F.3d at 691. Where the pencil was already inserted, anticipated pain is no longer the issue; either the girl is in pain or she is not, and it is clear from the expression on her face that she was not experiencing pain.

Probation takes issue with the parties' agreement that Ryan should benefit from a three-level reduction, in accordance with USSG § 3E1.1, agreed to "based on Defendant's prompt acceptance

---

ornography_Offenses/index.cfm ).
[45] Presentence Investigation Report, pg. 61.

of personal responsibility."[46] Probation asserts that "there are
no extraordinary circumstances justifying a reduction for
acceptance of responsibility."[47] However, nothing in the plain-
text reading of the Guidelines indicates that such a reduction
is only applicable in "extraordinary circumstances." Rather, the
rule reads, "[i]f the defendant clearly demonstrates acceptance
of responsibility for his offense, decrease the offense level by
2 levels." USSG § 3E1.1(a). An additional level of reduction is
applicable where, like here, the defendant "timely notif[ies]
authorities of his intention to enter a plea of guilty, thereby
permitting the government to avoid preparing for trial and
permitting the government and the court to allocate their
resources efficiently." USSG § 3E1.1(b). Ryan entered a guilty
plea on May 09, 2018 and should get the benefit of the
reduction.

Probation cites to personal papers found in a warrantless
search of his cell at Wyatt as a basis to deny a reduction for
acceptance of responsibility. It is clear that these drawings
and papers, like Ryan's behavior more generally, are due to his
untreated Autism Spectrum Disorder. There are medical reports
that Ryan engages in self-harm, punching himself in the face and
arms. Ryan only ever had one hobby, interest or skill –

---

[46] Plea Agreement, pg. 5.
[47] Presentence Investigation Report, pg. 25, ¶ 104.

computers. Therefore, these drawings should be evaluated in the context of an individual who has had to simultaneously cope with his first incarceration, the news that he has had an undiagnosed mental health disorder for his entire life, and the loss of access to computers, his only source of comfort or distraction. The drawings do not reflect a concrete plan to commit wrongdoing, and only really provide details on how to obfuscate your online identity, and how the government is able to get around those smoke screens. This is not inherently criminal behavior – hiding your identity online, or describing how to do so, is not a crime. Mr. Lin did not receive a disciplinary report.[48]

Further, Probation reports that a book on computer hacking was found in another inmate's cell. All books that inmates receive must be preapproved by Wyatt administrators. Further, it is unclear how possessions found in another's cell are attributable to Ryan and should not serve as a basis for denying him the reduction that his plea provides. Mr. Lin did not receive a disciplinary report for this – his only disciplinary reports are for refusing to stand for count, twice.[49] Similarly, Probation stated that Ryan was found hacking the prison library computer, but Wyatt did not issue a ticket, even though this

---

[48] *See* Exhibit F, Disciplinary Reports.
[49] Exhibit F, Disciplinary Reports.

would be a serious and concerning violation of institutional rules.[50] Ryan has not received a disciplinary report since March 16, 2018, and only has two in total.[51]

The other drawings found in Ryan's cell are a list of countries, with facts taken from the CIA World Fact Book; a list of chemistry equations from an Introductory Chemistry textbook; and book summaries, including of the Art of Seduction. The Government sets forth a compelling narrative, planted by an anonymous jail informant, that all of these drawings taken together indicate a nefarious plan to bomb Government lawyers and flee to the Dominican Republic.[52] However, each of these drawings has a reasonable explanation.

Ryan is understandably concerned about finding a job as a convicted felon, post-release. He started making a list of countries that he could move to, which included the Dominican Republic. It did not include China on the list, because Ryan does not speak Mandarin or Cantonese, making it an unlikely place to "flee" to being neither on his list, nor a place where he is likely to be able to provide a life for himself post-incarceration. Post-release visualization is a healthy part of

---

[50] *See* Exhibit F, Disciplinary Reports. Per a conversation with Probation Officer, an incident report was issued, but no sanction was given to Ryan, indicating that Wyatt itself did not take the matter seriously as a security threat.
[51] Exhibit F, Disciplinary Reports.
[52] Supplemental Offense Conduct, pg. 6.

one's rehabilitation and it is a shame that the Government seeks to turn a virtue into a vice based on the unverified accusations of an untrustworthy third party.

Next, the Government points to Chemistry formulae as evidence of a bomb plot. However, they would be unable to point to any specific formula as the recipe for creating a bomb, because none exists within these drawings. These drawings represent introductory chemistry knowledge. They show conversion rates for feet, yard and miles; how to measure reaction quotients and energy; the point at which solid, liquid and vapor coexist in equilibrium; the molarity concentrations of solutions; the ideal gas laws; and quantum formulae. The only concerning part of this is that Government lawyers could not distinguish between benign chemistry principles and a verifiable bomb recipe.

Lastly, there are drawings described as a "chart regarding luring victims." This would be concerning, if this wasn't in fact a chart of the steps set forth in "The Art of Seduction" by Robert Greene. A cursory Google search reveals all of the steps in the chart are discussed in the book, making it more likely that this is Ryan taking notes while reading a book, trying to understand interpersonal relationships, rather than a plot to make more victims. Other book summaries exist in Ryan's drawings, which were all in a folder marked Attorney-Client

privilege, lending credence to this, rather than the Government's, view of the evidence. The Government, in its zeal to paint Ryan as a villain, has not done its due diligence in reviewing claims of a bomb plot, and all of the accusations in the Supplemental Offense Conduct should be summarily ignored.

### Collateral Consequences

In determining a sentence, the minimum mandatory is further warranted due to the profound effect that the collateral consequences of this case have had, and will continue to have, on this defendant.

Judge Frederick Block of the Eastern District of New York has stated:

> I am writing this opinion because from my research and experience over two decades as a district judge, sufficient attention has not been paid at sentencing by me and lawyers – both prosecutors and defense counsel – as well as by the Probation Department in rendering its pre-sentence reports, to the collateral consequences facing a convicted defendant.

*United States v. Nesbeth,* 188 F.Supp.3d 179 (E.D.N.Y. 2016). Judge Block further noted that "there is a broad range of collateral consequences that serve no useful function other than to further punish criminal defendants after they have completed their court-imposed sentences." *Id.* at 180. "[T]he effects of these collateral consequences can be devastating." *Id.* As several courts have recognized, collateral consequences of conviction, such as registration as a sex offender, are relevant

to the "need" for the sentence imposed to reflect just punishment. *See, e.g. United States v. Garate*, 543 F.3d 1026, 1028 (8th Cir. 2008) (overruling prior holding that it was inappropriate for the district court to consider the lasting effects of sex offender registration in sentencing); *United States v. Pauley*, 511 F.3d 468, 474-75 (4th Cir. 2007) (affirming a district court's lower sentence because the defendant lost his teaching job and pension as a result of his conduct).

It is well-established that the collateral consequences of child pornography convictions are extreme. What follows defendants who commit this class of crime is nothing short of a lifetime of shame and humiliation. Ryan will have to register as a sex offender, and that will hinder his eligibility for housing and employment. This is especially punitive for someone as young as Ryan, whose adult life had just barely begun at this time of this offense, and who unlike other distributors of child pornography has no pedophilic tendencies, but will nevertheless be branded as having them due to the nature of the conviction. Further, this conviction will follow him the rest of his life, regardless of whether he successfully treats his Autism Spectrum Disorder underlying this offense. For a young man now only 25 years old, this conviction carries a lifetime of shame and punishment.

As mentioned throughout, Ryan's only skill relates to computers. This sentence and the nature of the child pornography conviction will be an enormous barrier to employment in his field. After his sentence, he will have internet monitoring software on all of his devices, and will have to have any work computers approved by the Probation Office. It is hard to imagine any employer taking on this extra burden, and Ryan may struggle looking for employment for quite some time.

**The Need to Avoid Unwarranted Sentencing Disparities**

The defendant's conduct is similar to other cases in this district where sentences below the guideline range have been imposed for defendants convicted of child pornography offenses, the most serious class of offense with which Ryan is charged.

In *United States v. Starr*, 3:12-CR-30036-WGY, this Court sentenced the defendant to 42 months imprisonment, after he pled guilty to 18 U.S.C. § 2252. This represented a downward departure from the mandatory minimum of 60 months, where the Government requested 57 months and the defendant was in possession of a child pornography cache with 2,900 video files and more than 100,000 image files. The defendant, like Lin, had an undiagnosed mental health disorder (Obsessive Compulsive behavior) that the Court noted was uncontrolled and untreated until after discovery of the files. What differentiates Lin from this and other defendants is where most possessors of child

pornography have a sexual interest in the children depicted therein, Ryan was instead using the prurient nature of the photographs to cause emotional distress to others, not because he harbors a perverse sexual attraction to children. This was a result of his interpersonal deficits, and once he started, he simply lacked the skills to stop, and had no idea that Autism Spectrum Disorder was in fact driving the majority of his behavior.

In *United States v. Pallazola,* 1:13-cr-10091-WGY, this Court sentenced the defendant to 300 months imprisonment, where the guidelines called for 360-840 months, after he pled guilty to 18 U.S.C. § 2251(a) (Sexual Exploitation of a Child) and 18 U.S.C. §§ 2252(a)(2) and (a)(4)(B). This Court accurately noted that the guidelines allowed for more time in this case, but that the mandatory minimum of 25 years was "sufficient and not greater than necessary to accomplish the rules"[53] because the defendant actually produced child pornography, forcing a minor to engage in sexual acts "for the purpose of producing a visual depiction of such conduct."[54] As this Court noted, and what should distinguish from Ryan's case, the 25-year mandatory minimum was appropriate because the defendant's actions were "hideous" and were "an extreme degree of physical and emotional horror." The

---

[53] Sentencing Transcript, 1:13-cr-10091-WGY.

[54] Indictment, ECF No. 12, Filed 04/02/13, 1:13-cr-10091-WGY.

mandatory minimum was sufficient to punish that abhorrent
conduct, and here the minimum is similarly sufficient to punish
Ryan's lesser, but still far out of societal bounds, behavior.

A review of 83 cases, spanning 2008-2018 from D. Mass., and
involving Child Pornography receipt, possession, or distribution
charges reflect that only one case went above the guidelines, 63
went below and 19 were within the Sentencing Guidelines. There
were 25 cases at or below the mandatory minimum of 5 years.

In another harassment case before this Court, *United States
v. Connor*, 15-10398-WGY, the defendant was sentenced to 26 days
time served, 36 months supervised release, with home confinement
for the first 10 months, which was a departure from the
guidelines of 24-30 months. There, the defendant engaged in
cyberstalking and extortion after a young woman decided to end
their romantic relationship. The defendant also threatened
physical harm and contacted the victim's friends and family in
order to continue his harassment, and threatened to share naked
photos of the victim with people she cared about. In deciding
not to impose incarceration, this Court noted that the defendant
was a "very mixed up young man" with the "wrong idea about
relationships with women." Further, your Honor noted that
"putting you behind bars for two years is not going to help
you." Ryan was similarly a very mixed up young man, with an
undiagnosed condition, and seven years in prison, while not

helping him, will serve as a deterrent to him and to others who use the internet to harass victims and carry out threats.

Lastly, the government requests an extremely punitive sentence of 210 months, or 17.5 years. This reflects a sentence that is greater than the sentence for forcible rape of an adult, killing a person in voluntary manslaughter, disclosing top secret national defense information, or violent extortion of more than $5 million involving serious bodily injury.[55]

### Conclusion

A sentence of 84 months incarceration is an appropriate punishment for Ryan Lin. It holds him responsible for the crimes he committed, while taking into account his lack of prior criminal record, his underlying condition, and the sentences imposed in similar and more serious cases. For these reasons, the defendant urges the Court to impose the mandatory minimum sentence. For safety reasons and given the non-violent nature of his conduct, he requests placement by the Bureau of Prisons at FCCI-Danbury. He joins Probation's recommendation to RDAP.[56]

RYAN S. LIN

---

[55] Mark Osler, "Amoral Numbers and Narcotics Sentencing," University of St. Thomas (Minnesota) Legal Studies Research paper No. 13-21, 2013, http://papers.ssrn.com/sol3/papers,.cfm?abstract_id=2271380 (last accessed Aug. 22, 2018). See USSC, "2016 Guidelines Manual," http://www.ussc.gov/Guidelines/2012_Guidelines/Manual_PDF/2016_Guidelines_Manual_Full.pdf, §§ 2A3.1, 2A1.2, 2B3.2, 2M3.3.
[56] PSR, pg. 46, ¶ 225.

By His Attorneys

CARNEY & ASSOCIATES

*J. W. Carney, Jr.*

J. W. Carney, Jr.
B.B.O. # 074760

Reyna Ramirez
B.B.O. # 698630

Carney & Associates
20 Park Plaza, Suite 1405
Boston, MA 02116
617-933-0350
jcarney@CARNEYdefense.com

September 26, 2017

Certificate of Service

    I hereby certify that this document filed through the ECF system
will be sent electronically to the registered participants as
identified on the Notice of Electronic Filing (NEF) and paper copies
will be sent to those indicated as non-registered participants on or
before the above date.

*J. W. Carney, Jr.*

J. W. Carney, Jr.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|                               |     |                        |
|-------------------------------|-----|------------------------|
| UNITED STATES OF AMERICA      | )   |                        |
|                               | )   |                        |
| v.                            | )   | CRIM. NO. 18-10092-WGY |
|                               | )   |                        |
| RYAN S. LIN                   | )   |                        |

**AFFIDAVIT IN SUPPORT OF DEFENDANT'S SENTENCING MEMORANDUM**

I, J. W. Carney, Jr., state that the facts contained in the attached motion are true to the best of my information and belief.

Signed under the penalties of perjury.

*J. W. Carney, Jr.*

J. W. Carney, Jr.

September 26, 2017