EXHIBIT A

*Letter from Songlin Mo and Sean Lin (Ryan Lin's Parents)*

August 22, 2018

Judge William Young
United State District Court
Worcester, Massachusetts

Dear Judge Young:

Our names are Sean Lin, a senior member of technical staff at GlobalFoundries
Inc., and Songlin Mo, a senior auditor investigator with New York State Office of
the Attorney General, and we are Ryan Lin's parents. Ryan is the older of our two
children.

Ever since Ryan was in kindergarten, when he was first chastised for throwing
papers around on a bus for seemingly no reason, Ryan has always struggled
socially. Although he performed well academically and was never violent, he
lacked friendships and struggled to form close bonds with others. These character
flaws unfortunately continued all the way to his adult years, resulting in social
solitude and loneliness for the majority of his life. He was always very quiet and
preferred engaging in solitary activities such as reading books and writing code.

At one point, when he was in middle school, we brought Ryan to a social worker to
attempt to address his social problems. However, we were not able to continue the
therapy for long enough since his father eventually developed end-stage kidney
failure and went into years of dialysis. This was a stressful time for the whole
family and undoubtedly left its mark upon us all. Yet, even in spite of this, Ryan,
who was only in middle school at the time, took it upon himself to help out the
family by doing household chores and taking care of his younger sister during
these troubling times.

During high school, Ryan also volunteered for two years at Yale New Haven
Hospital and Northford Public Library. Furthermore, he had an internship during
his junior year in college and was offered a full-time position immediately after
graduation because of his excellent work ethic. When Ryan was living at home
with us, he appeared to be a normal, caring, and functioning person. We could tell

he was lonely or frustrated sometimes, but our support as a family seemed to always be able to calm him down.

As of today, Ryan is now being medicated and is taking active measures to improve his social skills and mental state at the detention center where he presides. He has told us that he now feels much less anxious, and that had he been of the same healthy mindset back then as he is now, he would not have performed his misdeeds. Moreover, he now participates in Bible study and has read dozens of books regarding topics such as self-awareness, mental health, and spirituality.

It is true that our son has indeed strayed from the path that we had once hoped for him. However, we know from the bottom of our hearts that Ryan is not a violent person by nature. Nobody in our family has ever owned a firearm, touched any weapon, or inflicted violence upon others in our lifetimes. We always taught our children to be respectful and responsible. We are confident that when Ryan does eventually recover, he will be the virtuous person who we have raised and have always expected him to be.

Looking forward, Ryan has said that he wants to be a mathematician when he is back (he has practiced over one thousand math exercises in his time at the detention center). We sincerely hope that someday he can use his talent and fundamentally generous heart to help rather than hurt people. We are not giving up on him and will work our absolute hardest as his family to reform him into a person worth respecting.

Thank you so much for spending the time reading this letter.

Respectfully yours,

Sean Lin and Songlin Mo
17 Howansky Drive
Watervliet, NY 12189

EXHIBIT B

*Dr. Mendoza Report (Evaluation)*



BOSTON FORENSIC
ASSOCIATES, LLC

ROBERT J. MENDOZA, PSY.D.
PRESIDENT

WILLIAM S. STONE, PH.D.
LISA IGUCHI, PH.D.
SHANNON ABRAHAM-COOK, PH.D.

## NEUROPSYCHOLOGICAL AND PSYCHOLOGICAL EVALUATION

**Name:**            Ryan Lin
**Date of Birth:**   October 14, 1992
**Age:**             25
**Attorney:**        J.W. Carney, Jr., Esq.
**Evaluator:**       Robert J. Mendoza, Psy.D.
**Dates of Evaluation:** December 12, 2017, February 1, 2018, and February 8, 2018
**Date of Report:**  February 22, 2018

**IDENTIFYING INFORMATION AND CIRCUMSTANCES OF REFERRAL:** Mr. Ryan
Lin is a 25-year-old man referred by his attorney, Mr. JW Carney, Jr. for the purposes of a
psychological evaluation. Mr. Lin has a long and documented history of what has been
characterized as odd behavior including impaired interpersonal interactions, difficulty with
reasoning, and demonstrating illogical behaviors. These behaviors began in childhood and have
persisted into adulthood. Mr. Carney has requested this evaluation to assist in determining the
nature and extent of any diagnosable mental health disorder that might be present, related to his
substantial clinical history. Further, attorney Carney has asked for this evaluation to address how
Mr. Lin's behavior and potential psychiatric and/or cognitive diagnoses might have contributed
to his current legal matters.

### SOURCES OF INFORMATION REVIEWED FOR THIS REPORT:

1. Multiple communications with Mr. Lin's attorney, J.W. Carney, Jr. and his office.
2. Psychological evaluation by this evaluator for approximately 13.2 hours over the course
   of three days (December 12, 2017, February 1, 2018, and February 8, 2018).
3. Communications with Mr. Lin's family (father: Sean Lin, mother: Songlin Lin, and sister:
   Reyna Lin).
4. Criminal Complaint and related legal documents, United States District Court, October 3,
   2017.
5. North Branford High School records.
6. Donald W. Wyatt Detention Facility Health Services Unit records.
7. Wayne Brunell, M.D. medical records.
8. Arbour Counseling Services medical records.
9. Attempts were made to obtain 7 Cups records; none of those materials were available at
   the time of this report.

**WARNING OF LIMITS OF CONFIDENTIALITY:** On all occasions, prior to beginning the evaluation, Mr. Lin was informed that I had been retained by his attorney to evaluate his current psychological presentation. He was also informed that our conversation was a privileged communication of which only his attorney would be informed. He was further informed that in the case that he and his attorney determined that providing information to the Court that is contained in this report and/or obtained during the evaluation would be helpful, any such information could then be made available to the Court. He was also informed that participation in this evaluation was voluntary. On all three occasions, Mr. Lin was able to sufficiently paraphrase the limitations of confidentiality and, therefore, the evaluation proceeded.

## RELEVANT HISTORY:

**Background Information:** The following information was gathered from the sources of information listed in this report.

Mr. Lin was born in Fuzhou, China. He reported that his mother, Songlin, is 53-year-old and he believes that she is employed as a forensic auditor. He stated that his father, Sean, is approximately 54-years-old and is a materials science researcher. Mr. Lin further indicated that he has a sister age 20, Reyna, a student at his alma mater, Rensselaer Polytechnic Institute (RPI). He believes that she is studying business and that she is a very good student. He reported a "pretty good" relationship with all family members. He denied any forms of sexual or emotional abuse or neglect in his family of origin.

Mr. Lin recalled that he left China when he was quite young and lived with his paternal grandparents for the first three years of his life while his parents were in the United States working towards academic degrees. His first language is Chinese, which was spoken in the home. He learned English primarily in school, once he moved to the United States. He did not recall very many memories around the time he moved to the US. He indicated that he moved to Missouri in 1996 (around the age of 4) and became a US citizen at the age of 15. He stated that he lived in Missouri for two years. His family then moved to New Haven, Connecticut. (Again, Mr. Lin, cannot recall precise dates but believes it was when he was in the first or second grade at the age of five). Mr. Lin indicated that he was in the same school system until he graduated from North Branford high school in 2011 with a grade point average of 3.7 out of 4.0.

Mr. Lin recalled that he was a "good student". Around the sixth or seventh grade, he reported that he began to have discipline issues and received approximately 20 in-school suspensions for "harassing people". He had difficulty providing details of this disruptive behavior, but recalled that it led to receiving services with a therapist. He did not recall details of this therapeutic encounter. Given his apparent and significant difficulty with interpersonal relationships, Mr. Lin was asked about the quality of his friendships. He stated, "I have some friends, most came and went." He was unable to describe any relationships outside of his family that had a significant impact in his life while he was in school. Further, Mr. Lin indicated that he has never had what he would refer to as a girlfriend or a romantic relationship, either during or after high school. He indicated that, while in high school, he continued to demonstrate disciplinary problems but could recall only one specific incident. Mr. Lin reported that he was accused of harassing individuals, but again, he could not recall the details. Mr. Lin did not provide details, but his family indicated

3

that he changed schools three different times before he graduated high school. Some of this was due to his difficulty adjusting to the school environment.

According to Mr. Lin's family, when he was in elementary school he was accused of drawing inappropriate figures and using musical instruments to make inappropriate gestures. He was also found putting trash in teacups--amongst other odd behaviors. According to both the records and his family, while in high school Mr. Lin was accused of hacking into Facebook profiles of classmates. Oftentimes this took the form of hacking into other students Facebook accounts or other social media to post negative comments about them. Mr. Lin also sent harassing poems to female classmates. He is also alleged to have hacked into the high school's computer system.

A review of school records indicates that while he did well academically, he did not receive straight A's. School records indicate that he did not demonstrate "consistent effort...lacks concern for accuracy... must improve listening skills...needs to improve his self-discipline... sometimes does not work cooperatively... is easily distracted... seeks attention inappropriately..." Records also indicate that he would use profanity and would spit at other students who would tell him to stop harassing them.

Mr. Lin's parents noted that he began to learn computer coding on his own in the seventh grade. They noted that he would often get up as early as 5 AM to write codes. His parents also stated that he began to engage in increased periods of self-dialoguing. His parents noted that he exhibited strange "tics" including random spasms of the hands/eyes.

After high school, Mr. Lin reported that he attended Carnegie Mellon University and studied computer engineering. He left after three semesters; "I didn't like it. It was too much work and I didn't have a social life." Upon inquiry, Mr. Lin further indicated that he had many conflicts with his roommate. But again, he stated, "I really don't remember a lot of what happened [with the roommate]."

After leaving Carnegie Mellon, Mr. Lin attended Hudson Valley Community College, approximately 30 minutes for Albany. He cannot recall why he chose that institution but believes that his mother may have offered that suggestion. He stayed there for one year, "not studying anything particular." According to his family, Mr. Lin would not complete any of his school work and failed all his classes in his third semester earning a 0.0 grade point average.

Mr. Lin transferred to RPI and studied computer science and graduated with a Bachelor of Science degree in computer science in 2015. He recalled that he was surprised that he was able to graduate because "I didn't pay attention in class and I only read the lecture notes." Mr. Lin stated that throughout all his time at RPI, he did not have many friends and socialized very little.

According to his family, Mr. Lin was initially accepted by others at RPI because of his technological abilities; he maintained the website for the International Chinese Study Association. But for reasons that are unclear, Mr. Lin then began deleting all his work on the website. He would harass fellow students to the point that they would report him to the dean of students. When others would ignore him, for justifiable reasons, he would feel slighted and attempted to "get back at them." On one occasion, it is alleged that he repeatedly created fake

4

social media accounts in the names of RPI classmates and left harassing messages through an anonymous account. He denied engaging in physical violence.

Following college, Mr. Lin moved to Boston to obtain employment. He worked exclusively in computer science positions. He was at his first job for four months and then was terminated because "[his] boss didn't like [him]." Mr. Lin recalled another job shortly thereafter where he remained for two months before being fired because he was coming in late and that his boss said to him, "you don't seem to care (about the job)." Mr. Lin further stated that he agreed with his supervisor's assessment about his motivation to remain employed. He was hired at another computer science organization and remained there for six months before he was once again terminated for "bad performance and coming in late."

Throughout his time in the Boston area Mr. Lin had several roommates and reported difficulty with most of them. This also included a time when he was in San Jose, California and experienced difficulties with his roommate. These difficulties ranged from relatively petty differences to much more significant conflicts stemming from his illogical, disorganized, and odd behaviors. For instance, Mr. Lin was noted to be running up and down the stairs in his apartment for no reason causing a disruption in the building. There were other times when Mr. Lin would run the water in the sinks full blast in the apartment, again for no reason. Other times he would turn on the bathroom lights and exhaust fans without reason. There were other instances when he filled up kitchen bottles and cans with oil and water, placing sugar, salt, detergent, and hand sanitizer in odd places in the apartment. One of Mr. Lynn's roommates also recalled an occasion when Mr. Lin placed bags of garbage in the closet--including spoiled foods. Other times, Mr. Lin reported that he went into other individuals' rooms to "just look around."

During his time living away from his family, they maintained close contact with him. Mr. Lin's family would travel to him or he would travel to his family in New York at least two times every month, and sometimes more frequently. His family was acutely aware of his inability to make friends, keep track of important financial issues in his life, and his overall difficulties sufficiently caring for basic daily activities.

Mr. Lin reports that he has never been married and stated that he has no children.

Mr. Lin denied any history of surgical procedures or any chronic medical issues. He denied that he is currently taking medications including psychotropics. He denied any history of head injury or loss of consciousness. He recalled that one time at the age of 13 he ran into a wall and had to have stitches but was unable to recall the details about the events.

Mr. Lin reported that he tried LSD on one occasion in the fall 2017 when his roommate gave him half a tab. Mr. Lin reported that, "I saw myself from a third person perspective and it helped my anxiety. The crash was unpleasant. I became really tired and I couldn't get to sleep, and I was dehydrated." He indicated that he started using marijuana on a limited basis, while at RPI, at the age of 18. He stated that marijuana helped him relax but, on some occasions, he became paranoid. He reported that his period of most frequent marijuana use was when he was 22 or 23-years-old and he was using almost every day. He reported intermittent use in the past two or three years. Mr. Lin reported that he began using alcohol at the age of 18 but drinks infrequently.

*Other Information--obtained through communications with Mr. Lin's family:* According to his mother, Mr. Lin demonstrated significant issues around food beginning at an early stage. She stated, "He did not have breast-feeding instincts in the first couple of days of birth." Mr. Lin had difficulty chewing solid foods and was not able to do so until the age of five. On some occasions, he would choke because his food had not been properly masticated. This impacted his eating. It would typically take him an hour to finish meals. He would spend 10 minutes at the table, walk around, eat for a few minutes, and then repeat the same behavior pattern, usually three times for each meal. His family went on to report that Mr. Lin does not like changes and that he ate the same foods in restaurants to the point that waiters in restaurants would know what his order would be without asking him. The family also stated that he likes to eat the same foods at home as well.

Mr. Lin's sister, Reyna, noted that Mr. Lin was particularly awkward around females, not knowing how to communicate with them, even with his sister's friends who were at least five years younger than he was. When he was young, Mr. Lin would often step on people's toes to annoy them. His sister believes that it was his attempt to engage others.

Mr. Lin's family described how socially awkward he was as a child and that he has had difficulty throughout his life with social interactions. His family noted that he had no hobbies or interests other than "playing computer games and writing [computer] codes." When asked about hobbies, Mr. Lin indicated that he enjoys playing video games. He described playing for "hours and hours" when he was a child and adolescent. He stated that he continued playing video games daily as an adult, provided he was not working or obsessing over other matters. Even online gaming, however, caused interpersonal distress. He would often hack into other individuals' accounts and play games under their screen personas and engage in harassment of other players. If his attention was not focused on computers, Mr. Lin was unable to organize his cognitive abilities to attend to other activities.

Mr. Lin's family summarized his behavior in the following way:

> He has always been very naïve and childish. Mentally he was like a 15-year-old even when he was in his 20's. [He] always was a weird kid, everyone said so…weird gestures: eyes roll into the back of his head in public and would have a weird posture. Self-talk, talking to himself. Does not seem aware that he is talking to himself…He cried a lot… that lasted until middle school…We really never would have thought this [current criminal matter] would have ever happened though." Mr. Lin's father stated, "He is not of this world, he is in a dream world.

*Review of medical records:* Mr. Lin was in mental health treatment on several occasions. Records regarding what appears to be his first therapeutic intervention in grade school were not available for review.[1] Mr. Lin did not recall this early engagement but stated that it, "really did not much help me back then." According to Mr. Lin's parents, the mental health provider at that time concluded, "Ryan has his own rules and doesn't follow social rules." Some of Mr. Lin's

---

[1] According to his parents, Mr. Lin began seeing a social worker, "David LICSW," at the age of nine. There were questions about emotion dysregulation and possibly issues related to Mr. Lynn being bullied by other students.

6

roommates and others who had difficult interpersonal interactions with Mr. Lin have
recommended to him to seek mental health services. On some of those occasions, Mr. Lin did
not understand why he would need such help.

Wyatt Detention Facility records: Mr. Lin was initially evaluated on October 6, 2017. At that
time, no mental health issues were noted by the evaluator. On November 21, 2017, the social
worker noted that Mr. Lin was reporting anxiety, he was very guarded and there was no
indication for immediate services. On December 6, 2017, Mr. Lin reported to mental health
services that he had been "stressed" since he was admitted to the facility. He was reporting
anxiety and poor sleep but the clinician indicated that he was presenting with no symptoms of
distress. He was not prescribed psychiatric medication but was requesting to speak with the
psychiatrist to obtain medications to improve his sleep. He was noted to be in a "jubilant mood."
It is unclear precisely what is meant by that term. No psychotic process was noted and he was
assessed to be a low risk for self-injury. Notes at that time did not indicate that he was referred
for evaluation for psychotropic medications. No diagnosis was given at that time.

On December 13, 2017, mental health met with Mr. Lin in response to reports that he had been
engaging in self-injury by punching himself in his cell. Mr. Lin denied any such behavior and
that it was another inmate that punched him in the face. He denied any risk of harm to himself.
The mental health clinician noted that Mr. Lin was anxious but denying any harm to himself or
other individuals. He was assessed to be a low to moderate risk for self-injury. He initially
reported that he obtained injury by falling from the top bunk in his cell. On December 14, 2017,
he was diagnosed with "Anxiety Disorder NOS." Records note that he was "lethargic during the
session." He was assessed to be a low to moderate risk for self-injury. He was placed on 15-
minute observation checks while he was housed in segregation following the report of a concern
that he was engaging in self-injurious behaviors. On December 15, 2017, mental health staff met
with Mr. Lin who initially refused to speak with them. Eventually, he engaged a mental health
clinician and he reported that he was "fine." He was wanting to return to his assigned housing
unit. He denied any thoughts of self-harm. Once again, he was noted to be "lethargic during the
session." He was assessed to be a low risk for self-injury. He continued to be housed in
segregation, but 15-minute observation checks were discontinued. His diagnosis continued
unchanged ("Anxiety Disorder NOS").

7 Cups: This is an online service self-described as, "Free, Anonymous, and Confidential Online
Text Chat with Trained Listeners, Online Therapists, and Counselors." According to Mr. Lin, he
engaged this service several times a week in 2017 and found it "interesting" to be able to talk
about everyday matters to someone via electronic means. He indicated that he mostly talked
about his inability to understand why others misunderstood his communications with them.

Arbour Counseling Services records: Records indicate that Mr. Lin initially sought services at
Arbour on July 16, 2017 for complaints of anxiety, a history of feeling bullied, and feeling
persecuted by others and having no friends. He also complained of "awkwardness" which led to
job loss. He admitted to frustration with his roommates leading him to consider engaging in
harassing behaviors towards them. The therapist diagnosed him with Generalized Anxiety
Disorder with a "r/o neurological condition." The nurse practitioner diagnosed him with
"unspecified depression disorder, rule out attention deficit hyperactive disorder, and rule out

other mood disorder." Notes also indicate that he was reporting depression, difficulty concentrating, and making decisions. He endorsed obsessive thoughts and behaviors that were causing him considerable distress and interfering with normal routines, work, and social relationships. Over the next two months of treatment, he reported intrusive thoughts that were impacting his focus. These thoughts appeared to be related to his history of being bullied. He also reported that certain individuals accused him of being "mindless" and not paying attention to what they were saying. Mr. Lin was also reporting low motivation and procrastinating at work. In September 2017, Mr. Lin was requesting psychotropic medications. He was prescribed Cymbalta, a medication that can treat anxiety and depression. Arbour records indicate that he tried someone else's Effexor (antidepressant) and Wellbutrin (antidepressant and sometimes used to treat attention disorders) which he did not find helpful. According to medical records, Mr. Lin was discharged from services in October 2017.

Dr. Wayne Burrell records[2]: Mr. Lin was evaluated by a psychiatrist on January 30, 2017. Mr. Lin complained of "either anxiety or ADHD." Mr. Lin reported ongoing intensive thoughts that involved his roommate. No indications of self-harm or threat to another person was noted and there were no indications of auditory or visual hallucinations or other psychotic process. Notes appear to indicate that Mr. Lin was nervous and complaining of memory loss and confusion. The doctor noted a potential autism spectrum disorder including difficulties with nonverbal communication. His speech was noted to be of a fast rate. Mr. Lin reported that he was using marijuana four to five days a week, but other details of the use are not clear from the notes. The psychiatrist diagnosed Mr. Lin with "Anxiety NOS, r/o ASD, rule out ADHD." The psychiatrist goes on to write that, "I decline to accept him [Mr. Lin] as a patient because I feel he needs to see a psychiatrist that has more experience with ASD than I have."

**MENTAL STATUS AND CURRENT PSYCHOLOGICAL FUNCTIONING:** On all three days of the evaluation, Mr. Lin was evaluated in an interview room at the Wyatt Detention Facility. He was appropriately groomed and attired on all occasions. There was indication of psychomotor agitation. He was noted to be fidgety, tapping his fingers and shaking his leg, throughout all three days. He wore prescription eyewear during the examination. His gait was unremarkable. His spoke at a normal tone but his rate was rather quick, and he had a mild stutter at times.

Mr. Lin's affect was not always consistent with the content of the conversation. He seemed to have a nervous smile as he discussed more difficult matters. Oftentimes when he was not certain of a response on testing, he would smile and ask if he had provided the correct response. On other occasions, he would try and look ahead in the test stimuli and was told to stay with the question being asked. He seemed to have difficulty staying focused on certain aspects of the clinical interview, but he was quite focused during the neurocognitive testing. Specifically, he became anxious as he discussed his legal matters and his difficulties understanding the consequences of his behaviors. This difficulty with affect and attempting to stay focused on some tasks was evident on all three days of the evaluation. On the first day of the evaluation, Mr. Lin reported his mood to be, "I guess okay. Well, maybe not. I guess okay but maybe not." On the other two days, he reported his mood to be, "Okay, but I'm in here [incarcerated]."

---

[2] Several aspects of this medical record are illegible. The psychiatrist has handwritten his notes and uses abbreviations that are difficult to discern especially given the poor quality of his penmanship.

Throughout the three days of the evaluation, he denied both suicidal and homicidal ideation.

Mr. Lin was oriented to who he was, where he was, to the day of the week, the month, and the year on all three days of the evaluation. He denied any hallucinations, and none were noted. He denied any fixed false beliefs (delusions). He was able to superficially acknowledge that his behaviors have led to his current legal circumstances. He did not demonstrate any insight into how those behaviors were linked to his current circumstances. There is significant evidence throughout Mr. Lin's psychosocial history of obsessive thinking and compulsive behaviors. During the three days of this current evaluation, Mr. Lin appeared to be hyper-focused at times on the actions of his roommates and his difficultly understanding how some of his behaviors would be considered inappropriate. When he was redirected to the topic, he was able to generally successfully complete the task. There is no specific indication of compulsive behaviors although there was significant structure to the three days of the evaluation and compulsive behaviors might be more difficult to identify. As noted earlier, he seemed to have excess motor movements. Mr. Lin was able to demonstrate logical, albeit generally concrete thinking. He made no attempts at humor and demonstrated basic social skills.

## NEUROCOGNITIVE AND PSYCHODIAGNOSTIC TESTS AND PROCEDURES ADMINISTERED:

Test of Nonverbal Intelligence-Fourth Edition
Wechsler Adult Intelligence Scale-IV (10 Primary Subtests)
Wechsler Memory Scale-IV (Logical Memory I and II, Visual Reproduction I and II, Symbol Span)
Wisconsin Card Sorting Test-64-Computer Version 2
Structured Interview for Psychosis-Risk Syndromes
California Verbal Learning Test-II (Standard Version)
MSVT
Advanced Clinical Solutions (Word Choice and Social Perception)
Controlled Oral Word Association Test (F-A-S, Animals)
Connor's Continuous Performance Test II
Extended Complex Figure Test (Recognition and Matching Trial)
Digit Vigilance Test
Rey-Osterreith Complex Figure
TOMM
Clock Drawing Test
Hooper Visual Organization Test
Stroop Neuropsychological Screening Test
Boston Naming Test
Color Trails Test (Form A: 1 and 2)
Peabody Picture Vocabulary Test, Fourth Edition
Developmental Test of Perception-Adolescent and Adult
Rorschach Inkblot Test (R-PAS administration and scoring)
M-FAST
Personality Assessment Inventory
Ritvo Autism Asperger's Diagnostic Scale-Revised (RAADS-R)

**CLINICAL IMPRESSIONS:** Mr. Ryan Lin is a 25-year-old man who was referred by his attorney, Mr. JW Carney, Jr. for the purposes of a mental health evaluation. Mr. Lin has a lifelong history of impaired interpersonal interactions, strained logic, and behavior that has been characterized as bizarre and odd. Attorney Carney is requesting this evaluation to assist in better understanding the nature and extent of any mental health issue that might be present. In addition, attorney Carney has also requested an opinion regarding how any potential mental health issues might have impacted behaviors related to Mr. Lin's current legal circumstances.

*Diagnosis:* Based on a review of records, communications with Mr. Lin's family, and a comprehensive clinical evaluation including neuropsychological and psychodiagnostic testing, there is substantial data to support the diagnostic criteria as set forth in the Diagnostic and Statistical Manual of Mental Disorders-Fifth Edition (DSM-5) for Autism Spectrum Disorder, Overall Between Severity Level 1 and 2 (social communication and restricted, repetitive behaviors), Without accompanying intellectual impairment, Without accompanying language impairment.

### *Related Signs and Symptoms:*

Mr. Lin demonstrates persistent deficits in social communication and social interaction in multiple contexts. He has difficulty communicating in interpersonal interactions, relating emotional content, intentions, and significant difficulty when asking for his needs to be fulfilled. He also demonstrated an impairment in responding to the needs of others during the routine course of human interactions.

Mr. Lin also has a significant deficit interpreting nonverbal and verbal social cues. He appears to be unable to appreciate many social mores and conventions. He has difficulty maintaining adequate eye contact and demonstrates anxious and rigid body postures when communicating with others. He has a lifelong history of demonstrating an almost complete inability to develop, maintain, and understand interpersonal relationships in almost all social contacts. In sum, deficits related to social communication and social interaction are significantly impaired.

Mr. Lin also demonstrates a narrow focus of restrictive and repetitive behaviors related to specialized interests especially regarding high restricted, fixated interests with an abnormal level of intensity and focus that has led to a preoccupation and obsessive pattern of behaviors. In addition, there is a pattern of behavior related to Mr. Lin's need to have aspects of his life remain precisely the same. Without engaging in this pattern of similar behaviors, Mr. Lin evidences extreme distress, difficulty with transitions, and the need to maintain a rigid thinking pattern.

Symptoms related to the diagnosis of Autism Spectrum Disorder are present in Mr. Lin's early development and have been present throughout his life. Further, the symptoms have led to clinically significant impairment in multiple aspects of his life including social engagements, occupational pursuits, and day-to-day functioning including relationships with his housemates.

There is no indication of intellectual disability or other neurodevelopmental or other psychiatric disorders that might better explain the symptoms reviewed and applied for the diagnosis of

Autism Spectrum Disorder. Anxiety and obsessive and compulsive behaviors appear to be most likely related to the diagnosis of Autism Spectrum Disorder.

*Supporting Data:* Mr. Lin demonstrates a lifelong pattern of deficiency in social awareness. This includes impaired interpersonal skills, difficulty understanding social cues and, at times, demonstrating even the most basic appropriate social responses.

Mr. Lin has also consistently demonstrated communication deficits: an inability to communicate his thoughts and feelings to others as well as understanding the reciprocal nature of communication with another individual.

Although Mr. Lin is of average intellect and does not demonstrate focal cognitive language deficits, Mr. Lin struggles to find the appropriate words to describe even basic emotions that he is experiencing. He demonstrates a lack of understanding of language and instances of humor, sarcasm, and other forms of communication that requires an ability to interpret a person's intentions and context. Mr. Lin demonstrates inflexible patterns of behaviors becoming hyper-focused on a narrow range of interest (computer science) and then obsessively engaging in increasingly repetitive related activities.

Mr. Lin speaks with a relatively narrow range of affect, stuttering occasionally, and at a fast rate. This further complicates his ability to adequately communicate with others.

As a child, Mr. Lin had no friends and was bullied. Although Mr. Lin expresses a desire to engage with others on some basis, he has never demonstrated the associated skills to do so. He demonstrated narrow pursuits, learning how to write code in seventh grade and maintaining this singular focus on computers throughout his life, including computer gaming.

Emotionally, Mr. Lin has demonstrated a relatively limited range of affect and very little insight into his emotional life and understanding of the feelings of others. There is evidence that he experiences significant levels of anxiety, racing thoughts, illogical feelings, confusion about relationships, and difficulty expressing any of those feelings. There have been occasions when Mr. Lin has verbalized difficulty with sleep during periods of time when he has been involved in situations that could easily bring about stress for anyone. However, when asked to comment on these episodes and how lack of sleep might be related to emotional discomfort, Mr. Lin stated, "Yeah, I guess that might be possible. But I don't think so."

*Issues related to Mr. Lin's current legal matters:* Given the clinical formulation offered in this report, it is not difficult to imagine that there may be features of Mr. Lin's mental illness that could be related to the thoughts and behaviors associated with his current issues.

An odd, illogical, inflexible, obsessive, compulsive, and self-destructive pattern of thought and behavior appears to have motivated Mr. Lin to engage in using technology for socially inappropriate and disruptive purposes. Throughout his life, Mr. Lin has focused his attention on relatively random people and obsessively and inflexibly pursued an illogical pattern of behaviors to engage that person and to learn more about them. His odd and bizarre approach to understanding someone and connecting with an individual, has led to a constant pattern of self-

destructive behaviors. These behaviors are rarely well though-out. His behaviors are doomed to fail, yet even as he recognizes these failures, he continues to engage in the same behaviors unabated.

Although there is evidence that Mr. Lin recognized that there could be dire consequences associated with his behaviors in this current legal matter, including involvement with law enforcement, his inappropriate behaviors continued. The drive to engage in the behavior appeared stronger than his ability to realistically understand the consequences should he continue. This obsessive pattern of inflexible, constant, restrictive, albeit inappropriate, behaviors is quite consistent with an individual with an autism spectrum disorder.

Mr. Lin's behaviors associated with his current legal matters were clearly inappropriate. On a very basic level, Mr. Lin certainly understands this. However, he viewed these actions as the only way that he could find to have other individuals pay attention to him on any level. Mr. Lin has spent a lifetime being ignored by others, bullied by some, and most likely marginalized in whatever educational or vocational setting that he was in. Mr. Lin understood at an early age that he could use computers to reach others in ways that he couldn't otherwise. While he saw the consequences of these engagements as potentially negative (having caused difficulties in high school, college, and after college), it was still the only way to have others begin a discussion with him. The extent of the reaction from others, as well the consequences, was less relevant to him than having someone not respond to him at all.

Using computers in this manner has been the only way that Mr. Lin has been able to engage people. The fact that others responded to him in a negative fashion was a response that he has difficulty interpreting. Mr. Lin demonstrates a deficit of understanding social responses, even when those responses are seen by others as direct and specific. Mr. Lin was queried about his understanding that some of the things that he may have said and done could have caused harm to others. While Mr. Lin cognitively understands what it means to bring physical and emotional harm to others, he simply does not have much of the neurology associated with appreciating what that might actually mean on an emotional level.

Mr. Lin graduated from a prestigious college and has demonstrated a technical ability that many people would attribute to a highly intelligent individual. It is important to point out that Mr. Lin's overall intellectual functioning is solidly within the average range but not any higher.[3] It is not uncommon that individuals with autism spectrum disorders have developed highly specialized interests and abilities in limited areas while still performing within the average range of overall intelligence. Despite an average intellect and reasonably adequate language skills, Mr. Lin has difficulty understanding and articulating how inappropriate his behavior is. This is largely because of his poor understanding of social convention. Along with the fact that understanding how things might emotionally impact another individual is especially complex given how difficult it is for him to understand his own emotions--much less how someone else might feel.

When Mr. Lin was asked to explain his reasoning behind his disruptive behaviors, he simply shrugged his shoulders and could not provide a coherent response. When he is offered a reframe

---

[3] Estimated IQ of 101, 53rd percentile (Wechsler Adult Intelligence Scale-IV-GAI) and estimated IQ of 101, 55th percentile (Test of Nonverbal Intelligence-Fourth Edition).

that maybe he thinks of things differently than other people and that maybe he had not thought through the impact of his words and behaviors, Mr. Lin stated, "I guess my mind sometimes isn't clear." On follow-up, Mr. Lin demonstrated no insight into what this meant.

Consistent with autism spectrum disorders, it is important to point out that organized, precise, logical, well-thought out cognitive processes may not always be present. Perseverative, obsessive, and compulsive thinking and behavior can overcome individuals with autism spectrum disorders and lead to decompensated, disorganized responses. Mr. Lin believes that he demonstrated a logical process by which to engage others via computer technology. However, there is evidence that, on many occasions, his behaviors became more intense, frequent, and less organized to the extent that Mr. Lin himself would comment at the time that his own behaviors did not make sense. The compulsions appeared to have overwhelmed him, and he felt the need to respond even if his responses were illogical, even to him. Again, individuals with autism spectrum disorders often require specialized forms of intervention to address not only inflexible, restrictive, stereotyped behaviors but also when to recognize that they are no longer able to control their behaviors and may require external forms of support to do so.

*Summary:* There is substantial information that Mr. Lin has demonstrated a lifelong history of difficulty initiating social interactions and has engaged in atypical and unsuccessful responses to interpersonal relationships consistent with the diagnosis of Autism Spectrum Disorder. These social impairments become more evident when he has less physical connection to family members who are able to provide external forms of support. Further, Mr. Lin has a long history of demonstrating inflexible behaviors, difficulty coping with changes and has developed a very specific, hyper-focused interest in one thing (computer science). His attempts to adapt his interest in computers to help him engage others socially has been wholly unsuccessful, leading to an inappropriate use of computers and an inability to understand the full consequences of his social and emotional inadequacies on others.

Please do not hesitate to contact me should you require any further information about my evaluation of Mr. Lin.

Robert J. Mendoza, Psy.D.
Massachusetts Licensed Psychologist, License Number 7275
Assistant Professor, Department of Psychiatry, Tufts Medical School
Chief of Clinical Psychology, Metro Boston Forensic Inpatient Service
Neuropsychologist, Tufts Medical Center
Neuropsychologist, Metro Boston Forensic Inpatient Service
President, Boston Forensic Associates, LLC

EXHIBIT C

*School Records*

# North Branford High School

**Michele Saulis**
PRINCIPAL

**Todd Stoeffler**
ASSISTANT PRINCIPAL
**Carter Welch**
DEAN OF STUDENTS

September 27, 2010
RE: Ryan Lin

To whom it may concern:

I am writing in reference to Ryan Lin. Ryan was enrolled in my PreCalculus Honors course during his junior year. He is currently enrolled in my department's AP Calculus course. In all of my interactions with him and those that I have witnessed, Ryan has shown himself to be an intelligent young man with a great deal of motivation and a thirst for knowledge.

As a student, Ryan is exceptional. Ryan is ranked in the top 2% of the graduating class and has earned awards of excellence in the areas of Language Arts, Mathematics and Social Studies. His academic standing and awards speak for themselves, but can not fully show the intense commitment he brings to his academic pursuits. Ryan was also nominated for, by me, and awarded the Rensselaer Medal for outstanding achievement in Mathematics and Science. Over the past two years I watched Ryan further develop into a student who is always fully prepared and willing to take the initiative in class to further his own progress and that of his peers. He was always willing to share examples of his work with the class. Ryan's ability to comprehend and discuss complicated and abstract concepts was inspiring. His natural ability and highly-developed critical thinking skills were always reflected in his work. I was so impressed with Ryan's abilities and work ethic that I recommended that he enroll in Advanced Placement Calculus this year. As well as earning him the chance to take college courses during high school, his abilities and strong work ethic have also enabled Ryan to participate in our Model United Nations and other programs for talented students. Ryan's capacity and desire for intellectual growth are without bounds in my opinion, he is an intelligent, hard working determined young man.

In addition to being an outstanding student, Ryan is also an exceptional young man. In my capacities as teacher, Honor Society advisor, staff member, and administrator, I have had numerous conversations with Ryan. I have found that he brings the same determination and pride I have witnessed in the classroom to all of his endeavors. In addition to being part of the Model U.N., Ryan has also been a member of the NBHS Tennis team, Interact Club, and our 8th Grade Orientation staff. Ryan has also volunteered for several area organizations independently.

Ryan will enhance any program in which he participates. He is self-motivated, responsible and intelligent. I hope that he will have the chance to display his talents at your institution. If I can provide you with any further information please feel free to contact me.

Sincerely,

Mrs. Tracy A. Wootton
Mathematics Curriculum Coordinator 9-12
North Branford Public Schools
twootton@northbranfordschools.org

# North Branford High School

49 Caputo Road
North Branford, CT 06471



Thunderbirds

Phone (203) 484-1465
Fax (203) 484-1233
*northbranfordschools.org*

29 September 2010

To Whom It May Concern,

Ryan Lin is a very intelligent young man with an active, analytical and creative mind and he will be an asset to your classrooms. He is a quick study, a fine scholar with a great work ethic, and he has an engagingly wry sense of humor. It has been a pleasure to have him as a student.

I taught Ryan in 10th grade English and in 11th grade Journalism. An avid scholar, he brought additional perspectives to our classroom discussions and tasks. He was always willing to participate, and did so effectively. His writing work for both classes was consistently well-researched and strong. He often went above and beyond the parameters of an assignment, contributing some wonderful work. He was a solid and active group member, able to work efficiently and well with peers. He is also a highly capable independent worker. He is a focused, responsible and independent person.

Due to his academic strengths, Ryan was the recipient of several academic honors at our school, including the Rensselaer Medal. Although he describes his own strengths as being in the fields of math and technical knowledge, he easily demonstrated strength in writing and in creative areas. In short, I believe he is multi-talented. I have no doubt that he will excel and achieve in a university environment.

In addition to his scholarly pursuits, Ryan has participated in our school community through his volunteer work with our Interact Club, our Model UN group, and in 10th grade, our tennis team. He has also assisted in preparing our 8th graders for the high school experience by working for our 8th grade orientation program. For our community at large, he has often volunteered at one of our public libraries, and at Yale-New Haven Hospital. One of his most interesting articles for our school newspaper was a piece on living in and being a member of the community of our town of North Branford.

I look forward to learning of Ryan's future endeavors, as I am certain he will dedicate himself to interesting and significant studies when he is in college. He is a natural scholar, yet with his myriad of skills and pleasant personality he will also be a fine addition to your campus community.

Should you have any further questions, feel free to contact me via my email address: hahlstrommiller@northbranfordschools.org.

Sincerely,

*H. Ahlstrom Miller*

Heidi Ahlstrom-Miller
English department

*The mission of North Branford High School, a caring community committed to excellence, is to prepare all students to be knowledgeable, life-long learners who think independently and are responsible contributing members within their community and throughout the world. We will achieve this by engaging each student in relevant and challenging educational opportunities and experiences in collaboration with family and society.*

Rensselaer Polytechnic Institute

honors

Ryan Lin

with the Rensselaer Medal Award

for outstanding academic achievement
in the study of mathematics and science



Rensselaer

Karen S. Long
Director, Undergraduate Admissions

Spring, 2010

# North Branford Intermediate School

654 Foxon Road
North Branford, Connecticut 06471
Telephone : (203) 484-1500

A+=97-100; A=93-96; A-=90-92
B+=87-89; B=83-86; B-=80-82
C+=77-79; C=73-76; C-=70-72
D+=67-69; D=63-66; D-=60-62
F=59 and below
S=Satisfactory; U=Unsatisfactory
I=Incomplete
High Honors=93+; Honors=83+

| NAME | GRADE | H.R. | NUMBER | YEAR | COUNSELOR |
|---|---|---|---|---|---|
| Lin, Ryan | 6 | 305 | 1113024 | 2004/ | Dziekan, Cathleen |

| COURSE NAME | TEACHER | 1ST QTR GRADE | 2ND QTR GRADE | 3RD QTR GRADE | 4TH QTR GRADE | FINAL GRADE | COMMENTS |
|---|---|---|---|---|---|---|---|
| Language Arts | Ifkovic | A- | A | B+ | A- | A- | Ryan was a pleasure to have as a student. |
| Math | Misiti | A- | A- | B | B | B+ | Ryan did a fine job this year. |
| Science | Mack | A | A | B+ | B+ | A- | Ryan was a pleasure to have as a student. |
| History | DePalma | B | A | B- | C+ | B | Ryan was a pleasure to have as a student. |
| French -Crimson | Kramer | S | S | | | | |
| Spanish-Crimson | Ducharme | | | S | S | | Ryan must improve listening skills. |
| Art -Crimson | Holland | B | | | | B | |
| Health -Crimson | Lacroix | | | B+ | | B+ | |
| Music-Crimson | Tatta | | | | A+ | A+ | Ryan performed exceptionally well this year. |
| Physical Ed.-Crim. | Evans/Shaw | | B+ | B+ | | B+ | |
| Rdg. Strategies-Crim | Torrente | | A- | | | A- | |
| Tech. Ed.-Crimson | Schaffer | | | | B+ | B+ | Ryan does a fine job. |
| Band | Tzetzo | A- | A- | A- | C | B | Student needs to improve his self-discipline. |
| Crimson Study | Ifkovic | | | | | | |

| | DAYS ABSENT | 0 | 0 | 1 | 2 | 3 | Parent's Signature: |
|---|---|---|---|---|---|---|---|
| | DAYS TARDY | 1 | 1 | 0 | 1 | 3 | |

### NORTH BRANFORD INTERMEDIATE SCHOOL
### 654 Foxon Road
### North Branford, CT 06471
### (203) 484-1500
## SUSPENSION NOTICE

Student's Name: Ryan Lin _____    Date: 6/13/05

Race/Ethnicity: W _____    Grade:6    Sex: M

Parent/Guardian's Name: ___ Mr. and Mrs. Lin

Address: _____ 3 Laraine Court, Northford, CT 06472

We are sorry to inform you that your son/daughter has been suspended from school for the
following infraction(s): ____ Mr. Schaffer observed Ryan making a sexually inappropriate gesture
with a wooden pole in tech ed class on 6/10/05.  When Ryan realized Mr. Schaffer saw him, he ran
over to put the pole back.  Ryan was suspended for a similar behavior on 5/15/05.

**Person Imposing Suspension:** _____ C. Imperato

**Type of Suspension:** _____ ISS (3 days)

**Date(s) of School Day(s) Suspended:** 6/14/05 – 6/16/05

**Return Date:** _____ 6/17/05 _____

During days of an out-of-school suspension the student is expected to remain indoors during school
hours and is not allowed on school grounds.  Students are not permitted to attend school activities
during in-school or out-of-school suspension.

If this policy is violated, an additional suspension may be imposed.  If school is cancelled for any
reason (weather, etc.) the suspension will advance accordingly.  Students are responsible for making
up tests, quizzes or other work that may have been missed during suspension.

Please speak to your son/daughter and reinforce the need for proper school behavior.  When a student
returns to school from an out-of-school suspension, he/she must be accompanied by a parent or
guardian.

**Counselor's Name:** K. Gorman _____

**Counselor Notified of Action on:** _____ 6/13/05

**Principal:** _____    **Vice-Principal:** _____

| Original: | Ms. Imperato |
|---|---|
| cc: | Dr. Wolfe |
| | Mr. Davis |
| | Ms. Gorman |
| | Mr. Farnham |
| | Mrs. Ottenbreit |
| | Parent |

## NORTH BRANFORD INTERMEDIATE SCHOOL
### 654 Foxon Road
### North Branford, CT 06471
### (203) 484-1500
# SUSPENSION NOTICE

Student's Name: Ryan Lin _____ Date: 6/8/05

Race/Ethnicity: W _____ Grade:6  Sex: M

Parent/Guardian's Name: ___ Mr. and Mrs. Lin

Address: ___ 3 Laraine Court, Northford, CT 06472

**We are sorry to inform you that your son/daughter has been suspended from school for the following infraction(s):** ___ Ryan continues to make inappropriate remarks of a sexual nature to peers. In this situation, Ryan said that one girl was pregnant and claimed to have seen another female peer naked.

**Person Imposing Suspension:** ___ C. Imperato

**Type of Suspension:** ___ ISS (1 day)

**Date(s) of School Day(s) Suspended:** 6/9/05

**Return Date:** ___ 6/10/05

During days of an out-of-school suspension the student is expected to remain indoors during school hours and is not allowed on school grounds. Students are not permitted to attend school activities during in-school or out-of-school suspension. **Ms. Gorman and Ms. Imperato reviewed the school's sexual harassment policy with Ryan (again) on 6/7/05. Ryan has been given a copy of the Student Handbook policy, and also "Sexual Harassment in Schools", a publication of the CT State Board of Education.**

If this policy is violated, an additional suspension may be imposed. If school is cancelled for any reason (weather, etc.) the suspension will advance accordingly. Students are responsible for making up tests, quizzes or other work that may have been missed during suspension.

Please speak to your son/daughter and reinforce the need for proper school behavior. When a student returns to school from an out-of-school suspension, he/she must be accompanied by a parent or guardian.

**Counselor's Name:** K. Gorman _____

**Counselor Notified of Action on:** ___ 6/8/05

**Principal:** _____ **Vice-Principal:** _____

| Original: | Ms. Imperato |
|---|---|
| cc: | Dr. Wolfe |
|  | Mr. Davis |
|  | Ms. Gorman |
|  | Mr. Farnham |
|  | Mrs. Ottenbreit |
|  | Parent |

NORTH BRANFORD INTERMEDIATE SCHOOL
654 Foxon Road
North Branford, CT 06471
(203) 484-1500

## SUSPENSION NOTICE

Student's Name: Ryan Lin                                                                   Date: 5/25/05

Race/Ethnicity: W                                                            Grade:6   Sex: M

Parent/Guardian's Name: __ Mr. and Mrs. Lin

Address:        3 Laraine Court, Northford, CT 06472

We are sorry to inform you that your son/daughter has been suspended from school for the
following infraction(s): ___ Ryan wrote an inappropriate message (with a sexual connotation) and
attempted to have it delivered to a female student. Due to earlier incidents, Ryan had previously been
instructed to have no contact with the female student.

**Person Imposing Suspension:** _____ A. Davis

**Type of Suspension:** _____ ISS (2 days) __

**Date(s) of School Day(s) Suspended:** 5/26/05 & 5/27/05 _

**Return Date:** _____ 5/31/05

During days of an out-of-school suspension the student is expected to remain indoors during school
hours and is not allowed on school grounds. Students are not permitted to attend school activities
during in-school or out-of-school suspension.

If this policy is violated, an additional suspension may be imposed. If school is cancelled for any
reason (weather, etc.) the suspension will advance accordingly. Students are responsible for making
up tests, quizzes or other work that may have been missed during suspension.

Please speak to your son/daughter and reinforce the need for proper school behavior. When a student
returns to school from an out-of-school suspension, he/she must be accompanied by a parent or
guardian.

**Counselor's Name:** K. Gorman

**Counselor Notified of Action on:** _____ 5/25/05

**Principal:** _____ Vice-Principal: _____

**Original:**   **Ms. Imperato**
**cc:**         **Dr. Wolfe**
                **Mr. Davis**
                **Ms. Gorman**
                **Mr. Farnham**
                **Mrs. Ottenbreit**
                **Parent**

## NORTH BRANFORD INTERMEDIATE SCHOOL
### 654 Foxon Road
### North Branford, CT  06471
### (203) 484-1500

## SUSPENSION NOTICE

Student's Name: Ryan Lin _____ Date: 5/16/05

Race/Ethnicity: W _____ Grade:6__ Sex: M__

Parent/Guardian's Name: ___ Mr. and Mrs. Lin _____

Address: ____ 3 Laraine Court, Northford, CT 06472

We are sorry to inform you that your son/daughter has been suspended from school for the following infraction(s): ___ Ryan made sexual gestures with his clarinet in the auditorium and in the hallway, where he was observed by Mrs. Brustman. Other students also report that Ryan was making inappropriate remarks.

Person Imposing Suspension:_____ C. Imperato _____

Type of Suspension:_____ ISS (1 1/2 days)_____

Date(s) of School Day(s) Suspended: 1/2 day 5/16 and all day 5/17 _____

Return Date:_____ 5/18/05 _____

During days of an out-of-school suspension the student is expected to remain indoors during school hours and is not allowed on school grounds. Students are not permitted to attend school activities during in-school or out-of-school suspension.

If this policy is violated, an additional suspension may be imposed. If school is cancelled for any reason (weather, etc.) the suspension will advance accordingly. Students are responsible for making up tests, quizzes or other work that may have been missed during suspension.

Please speak to your son/daughter and reinforce the need for proper school behavior. When a student returns to school from an out-of-school suspension, he/she must be accompanied by a parent or guardian.

Counselor's Name: K. Gorman _____

Counselor Notified of Action on: _____ 5/16/05 _____

Principal: _____ Vice-Principal: _____

Original: **Ms. Imperato**
cc:      **Dr. Wolfe**
         **Mr. Davis**
         **Ms. Gorman**
         **Mr. Farnham**
         **Mrs. Ottenbreit**
         **Parent**

**NORTH BRANFORD INTERMEDIATE SCHOOL**
654 Foxon Road
**North Branford, CT 06471**
**(203) 484-1500**

## SUSPENSION NOTICE

Student's Name: Ryan Lin _____ Date: 5/11/05
Race/Ethnicity:  W _____ Grade:6    Sex: M
Parent/Guardian's Name:  ___Mr. and Mrs. Lin_____
Address:  ___3 Laraine Court, Northford, CT 06472__

**We are sorry to inform you that your son/daughter has been suspended from school for the**
**following infraction(s):** ___Ryan drew sexual references on his clothing and made inappropriate
remarks to female peers.
**Person Imposing Suspension:**_____C. Imperato_____
**Type of Suspension:**_____OSS (2 days)___
**Date(s) of School Day(s) Suspended:** 5/12 – 5/13_____
**Return Date:**_____5/16/05_____

During days of an out-of-school suspension the student is expected to remain indoors during school
hours and is not allowed on school grounds. Students are not permitted to attend school activities
during in-school or out-of-school suspension.

If this policy is violated, an additional suspension may be imposed. If school is cancelled for any
reason (weather, etc.) the suspension will advance accordingly. Students are responsible for making
up tests, quizzes or other work that may have been missed during suspension.

Please speak to your son/daughter and reinforce the need for proper school behavior. When a student
returns to school from an out-of-school suspension, he/she must be accompanied by a parent or
guardian.

**Counselor's Name:** K. Gorman _____
**Counselor Notified of Action on:** _____5/11/05_____
**Principal:** _____ **Vice-Principal:** _____

**Original:**   Ms. Imperato
**cc:**         Dr. Wolfe
               Mr. Davis
               Ms. Gorman
               Mr. Farnham
               Mrs. Ottenbreit
               Parent

**NORTH BRANFORD INTERMEDIATE SCHOOL**
**654 Foxon Road**
**North Branford, CT 06471**
**(203) 484-1500**

## SUSPENSION NOTICE

Student's Name: Ryan Lin _____ Date: 12/7/04

Race/Ethnicity: W _____ Grade:6 Sex: M

Parent/Guardian's Name: ___ Mr. and.Mrs. Lin _____

Address: ___ 3 Laraine Court, Northford, CT 06472

**We are sorry to inform you that your son/daughter has been suspended from school for the**
**following infraction(s):** ___ Ryan has been making sexual innuendos and inappropriate sexual
remarks to peers. This behavior continued after the other students asked him to stop.

**Person Imposing Suspension:** ___ C. Imperato _____

**Type of Suspension:** ___ ISS (1 day) ___

**Date(s) of School Day(s) Suspended:** 12/8/04 _____

**Return Date:** ___ 12/9/04 _____

During days of an out-of-school suspension the student is expected to remain indoors during school
hours and is not allowed on school grounds. Students are not permitted to attend school activities
during in-school or out-of-school suspension.

If this policy is violated, an additional suspension may be imposed. If school is cancelled for any
reason (weather, etc.) the suspension will advance accordingly. Students are responsible for making
up tests, quizzes or other work that may have been missed during suspension.

Please speak to your son/daughter and reinforce the need for proper school behavior. When a student
returns to school from an out-of-school suspension, he/she must be accompanied by a parent or
guardian.

**Counselor's Name:** K. Gorman _____

**Counselor Notified of Action on:** _____ 12/7/04 _____

**Principal:** _____ **Vice-Principal:** _____

**Original:** **Ms. Imperato**
**cc:** **Dr. Wolfe**
**Mr. Davis**
**Ms. Gorman**
**Mr. Farnham**
**Mrs. Ottenbreit**
**Parent**

# NORTH BRANFORD PUBLIC SCHOOLS
## BUS CONDUCT REPORT

**STUDENT:** Ryan Lin

**DATE OF INCIDENT:** 3-18-04

**SCHOOL:** TVES

**AM or PM run** (PM run circled)

**GRADE:** 5

**ROUTE NUMBER:** 11

**TEACHER:** Barbara

**DRIVER:** Barbara

- [X] failure to remain seated
- [X] harassing others (see comment)
- [ ] refusing to obey driver (see comment)
- [ ] hanging out of window
- [ ] throwing objects (see comment)
- [ ] excessive noise
- [ ] fighting (see comment)
- [X] profanity (see comment)
- [ ] smoking
- [ ] vandalism
- [ ] spitting
- [X] other (see comment)

**DRIVER COMMENT:** Child using profanity and making sexual innuendos. Spits at children who tell him to stop.

- [ ] student conference
- [ ] student denied bus privilege from _____ to _____
- [ ] other action/administrator comment: _____

_____
administrator signature

_____
parent signature

- [ ] report sent home to parent
- [ ] telephoned parent

parent copy - white   administrator copy - yellow   teacher copy - pink   transportation copy - gold

EXHIBIT D

*Letter from Reyna Lin (Ryan Lin's Sister)*

August 21, 2018

17 Howansky Drive
Watervliet, NY 12189
Re: Character Reference – Ryan Lin

Judge William Young
United States District Court

Your Honor,

My name is Reyna Lin, a 21-year-old graduate student at Rensselaer Polytechnic
Institute. I am the sister of Ryan Lin, who is an alumnus of the same university, and who
I have shared a close relationship with throughout both our years as fellow students and
as brother and sister. I am writing to you today to appeal for understanding on behalf of
my brother.

Although the circumstances under which I am writing this letter are certainly unfortunate,
I can say with sincerity that my brother is an incredibly bright, promising, and inherently
kind-hearted young man. His deviance from what is inherently a calm and kind person
had come as a shock to us all as his family.

He was never good at communicating or saying the right things, but I always remember
him as the brother who tutored me when it was 2:00 AM and I was struggling with
understanding my computer science coursework, who picked me up whenever I was sick
from school without complaint, who'd buy me food when he had noticed I hadn't been
eating all day, and who always helped me out when I needed someone and nobody else
was there for me.

The news of my brother's incarceration has indeed been a humbling experience. Yet,
despite his stray off the path my family and I had once hoped for him, I know that he will
recover from this. We have a strong familial support network, complete with the
unconditional love of parents and sister, and I am confident that Ryan's desire to reform
is both sincere and rife with ambition, zeal, and remorse for these most unfortunate
misdeeds.

Thank you very much for your consideration.

Yours sincerely,

Reyna Lin

EXHIBIT E

*Wyatt Medical Records*

413, Mental Health Services and Suicide Prevention

Appendix E

## Donald W. Wyatt Detention Facility

### Health Services Unit/ Mental Health Progress Note

| Name: Lin, Ryan | Date: 12/13/2017 |
|---|---|
| DOB: 10/14/1992 | ID# 00578 |

Chief Complaint: "Observation/Segregation Assessment"

Interval History:  D: This writer met with pt in the HSU for a mental health observation assessment as it was reported pt has been engaging in self-injury by punching himself in his cell. This writer met with pt by the cell door. Pt reported he is doing "okay" today and requested he would like to return to his housing unit. Pt continues to deny he is not engaging in self-injury and disclosed that to this writer that another detainee punched him in the face. Pt reported that he disclosed this to security staff. Pt stated "I will say whatever because I want to go back to my cell right now." This writer informed pt that it is important to be an accurate reporter. Pt agreed. Pt continues to report a positive family support and speaks with them daily stating "I love myself and my family, I would never hurt myself." This writer assessed pt for safety and stability. Pt was able to answer the mental health risk assessment questions by denying thoughts of self-injury and denies harming himself. This writer educated pt on the sick-slip policy and how to access mental health services in the future if needed. Pt was able to ask questions regarding the sick-slip policy and how to appropriately contact mental health services. No further issues to report at this time. Session concluded.

Later, this writer returned to pt's cell and informed pt that pt is currently pending investigation as a result pt will be assessed for segregation. Pt was able to answer the mental health risk assessment questions by denying self-injury. Pt reports he is able to tolerate segregation as he will utilize his coping skills by reading, writing, and call his family supports. This writer informed pt that mental health segregation rounds are conducted twice a week and pt is able to write a sick-slip if he needs to contact mental health services. Pt was able to ask questions if needed.

A: On the MSE pt presents as neat, alert, oriented, talkative and appropriate. Pt is able to answer the mental health risk assessment questions by denying thoughts of self-injury. Pt presents with an anxious mood. Pt appeared to make good eye contact with speech at a rapid pace and normal volume. No delusions and/or hallucinations present during session. Pt currently denies SI/HI/SIB. Pt is currently a low to moderate risk for self-injury. Although pt presents with a positive future orientation reports say otherwise as pt's face is currently swollen from possible self-injury. Pt will continue to be closely monitored by staff.

P: This writer consulted with security staff, the shift commander, and the HSA. Pt will be housed in segregation for observation pending investigation and will be reassessed the following day. Will follow-up with pt per treatment plan protocol. Pt will be seen twice monthly secondary to monitor mood and PRN. Pt is aware on how to access mental health services if needed.

| Psych ROS: | Psychotic | Manic | Depressed | PTSD | |
|---|---|---|---|---|---|
| | OCD | GAD | | | |
| Somatic: | Sleep | Energy | Appetite | Interest | |
| | | Pain | Weak | Memory | |
| | | | Examination: | | |
| Neat | | | | | |

413, Mental Health Services and Suicide Prevention

Appendix E

## Donald W. Wyatt Detention Facility

## Health Services Unit/ Mental Health Progress Note

Name: Lin, Ryan                                                                    Date: 02/28/2018

DOB: 10/14/1992                                                                    ID# 00578-138

---

Chief Complaint: "Mental Health Appointment/Sick-Slip"

Interval History:  D: This writer met with pt in pt's assigned housing unit of J-1 for a (1:1) mental health appointment and in response to a sick-slip. This writer met with pt out of cell for a mental health contact. Pt continues to report that his psychiatric medication of Vistaril was recently increased in dosage but per pt's report he feels he "can't see a difference" in dosage. This writer politely informed pt that pt was recently seen and pt will be seen again per psychiatry protocol. Pt appeared to understand. It was reported by nursing staff that pt often appears with bruises on his face. When this writer inquired if pt was continuing to engage in self-injury, pt politely denied this stating, I am not hurting myself right now...when I get angry I do hit myself but the Vistaril helps with that." This writer assessed pt for safety and stability. Pt was able to answer the mental health risk assessment questions by currently denying thoughts of self-injury with no plan and/or intent at this time. This writer encouraged pt to make an anger management journal and documenting triggers for his anger. Pt agreed to do this for next session. Pt was able to ask questions if needed. Pt reports he feels he may have Asperger's Syndrome. Pt strategies, "I think there is something wrong with me." This writer informed pt that will consult with psychiatry regarding pt's presentation. Pt appeared appreciative of this.  This writer educated pt on the sick-slip policy and how to access mental health services in the future if needed. Pt was able to ask questions regarding the sick-slip policy and how to appropriately contact mental health services. No further issues to report at this time. Session concluded.

A: On the MSE pt presents as neat, alert, oriented, talkative and appropriate. Pt is able to answer the mental health risk assessment questions by denying thoughts of self-injury. Pt presents with an appropriate mood. Pt appeared to make good eye contact with speech at a rapid pace and normal volume. No delusions and/or hallucinations present during session. Pt currently denies SI/HI/SIB. Pt is currently a low risk for self-injury as pt reports he continues to engage with his peers, completing puzzles, and speak with his family supports daily.

P: Pt will be seen twice monthly secondary to monitor mood and PRN. Pt will continue to meet with psychiatry every 4-8 weeks for medication maintenance.  This writer will consult with psychiatry regarding pt's medication concerns and pt's current presentation. Pt will be enrolled in the mental health group that is facilitated twice a month. Pt is aware on how to access mental health services if needed.

| Psych ROS: | Psychotic | Manic | Depressed | PTSD |  |
|---|---|---|---|---|---|
|  | OCD | GAD |  |  |  |
| Somatic: | Sleep | Energy | Appetite | Interest |  |
|  |  | Pain | Weak | Memory |  |
| Examination: |  |  |  |  |  |
| Appearance: Neat |  |  |  |  |  |
| Motor: Normal |  |  |  |  |  |

413, Mental Health Services and Suicide Prevention

Appendix E

## Donald W. Wyatt Detention Facility

## Health Services Unit/ Mental Health Progress Note

Name: Lin, Ryan

Date: 03/29/2018

DOB: 10/14/1992

ID# 00578 -|ȜȜ

Chief Complaint: "Everyone should just mind their own business."

Interval History: D: This writer met with pt in pt's assigned housing unit of J-1 for an out of cell for a crisis referral made by nursing staff. It was reported by nursing staff that pt appeared to have several bruises on his right cheek. Per chart, pt has a significant history of engaging in self-injury by punching himself. This writer and pt discussed pt's bruises on his cheek. Pt admits that he has been engaging in self-injury by punching himself. Pt is unable to verbalize a trigger for his self-injury. Pt reports "I need my medication increased because it not helping. This writer politely informed pt that she will consult with psychiatry regarding pt's ongoing medication concerns. Pt appeared dismissive towards this writer often stating "well it is not working. I don't know when I will be seen." It appears that pt displays signs and/or symptoms that are consistent with Asperger's Syndrome. It appears that pt has several issues interacting with others, and following rules and/or expectations of the institution. Pt currently has a single cell at this time. This writer assessed pt for safety and stability. Pt was able to answer the mental health risk assessment questions by currently denying thoughts of self-injury. This writer educated pt on the sick-slip policy and how to access mental health services in the future if needed. Pt was able to ask questions regarding the sick-slip policy and how to appropriately contact mental health services. No further issues to report at this time. Session concluded.

A: On the MSE pt presents as neat, alert, oriented, talkative and appropriate. Pt is able to answer the mental health risk assessment questions by denying thoughts of self-injury. Pt presents with an anxious mood. Pt appeared to make good eye contact with speech at a rapid pace and normal volume. No delusions and/or hallucinations present during session. Pt currently denies SI/HI/SIB. Pt is currently a low to moderate risk for self-injury. Although pt presents with a positive future orientation reports say otherwise as pt's face is currently swollen from possible self-injury. Pt will continue to be closely monitored by staff.

P: This writer consulted with security staff, the shift commander, and the HSA. Pt will be housed in his current housing unit of J-1 for a close observation and be closely monitored by staff. Will follow-up with pt per treatment plan protocol. Pt will be seen twice monthly secondary to monitor mood and PRN. Pt will be seen by psychiatry every 4-6 weeks. This writer will consult with psychiatry regarding pt's presentation and acts of self-injury. Pt is aware on how to access mental health services if needed. Pt's diagnosis of Asperger's Syndrome will be added to pt's treatment plan.

| Psych ROS: | Psychotic | Manic | Depressed | PTSD | |
|---|---|---|---|---|---|
| | OCD | GAD | | | |
| Somatic: | Sleep | Energy | Appetite | Interest | |
| | | Pain | Weak | Memory | |
| Examination: | | | | | |
| Appearance: Neat | | | | | |
| Motor: Hyperactive | | | | | |

413, Mental Health Services and Suicide Prevention

Appendix E

## Donald W. Wyatt Detention Facility

## Health Services Unit/ Mental Health Progress Note

Name: Lin, Ryan

Date: 05/10/2018

DOB: 10/14/1992

ID# 00578-138

Chief Complaint: "I hit myself because I am bored."

Interval History:  D: This writer met with pt in the HSU for an out of cell for a crisis referral made by nursing staff. It was reported by nursing staff that pt had several bruises on his body. As previously noted and per chart, pt has a significant history of engaging in self-injury by punching himself. This writer and pt discussed continue to discuss pt's previous acts of self-injurious behavior. Pt reports that he has been engaging in self-injury when he is "bored or stressed". Pt is unable to verbalize a trigger for his self-injury at this time. Pt continues to report "I need my medication increased because it not helping. Pt is currently prescribed Vistaril. This writer politely informed pt that she will continue to consult with psychiatry regarding pt's ongoing medication concerns. Pt appeared appreciative of this and continues to engage in session. Pt has previously been dismissive with this writer but at this time is "trying" to participate in ongoing treatment with his mental health provider. Pt currently has a single cell at this time. This writer assessed pt for safety and stability. Pt was able to answer the mental health risk assessment questions by currently denying thoughts of self-injury. This writer educated pt on the sick-slip policy and how to access mental health services in the future if needed. Pt was able to ask questions regarding the sick-slip policy and how to appropriately contact mental health services. No further issues to report at this time. Session concluded.

A: On the MSE pt presents as neat, alert, oriented, talkative and appropriate. Pt is able to answer the mental health risk assessment questions by denying thoughts of self-injury. Pt presents with an anxious mood. Pt appeared to make good eye contact with speech at a rapid and pressured pace and normal volume. No delusions and/or hallucinations present during session. Pt currently denies SI/HI/SIB. Pt is currently a low to moderate risk for self-injury. Although pt presents with a positive future orientation reports say otherwise as pt's face is currently swollen from possible self-injury. Pt will continue to be closely monitored by staff.

P: This writer continues to consult with security staff, the shift commander, the HAS, and the DON. Will follow-up with pt per treatment plan protocol. Pt will be seen once a week secondary to monitor mood, PRN, and pt's ongoing issues regarding self-injury. Pt will be seen by psychiatry every 4-6 weeks. Pt is aware on how to access mental health services if needed.

| Psych ROS: | Psychotic | Manic | Depressed | PTSD | |
|---|---|---|---|---|---|
| | OCD | GAD | | | |
| Somatic: | Sleep | Energy | Appetite | Interest | |
| | | Pain | Weak | Memory | |
| Examination: | | | | | |
| Appearance: Neat | | | | | |
| Motor: Hyperactive | | | | | |
| Speech/Language: Normal volume with a rapid pace and pressured speech | | | | | |

413, Mental Health Services and Suicide Prevention

## Donald W. Wyatt Detention Facility

## Health Services Unit/ Mental Health Progress Note

Name: Lin, Ryan                                                          Date: 05/14/2018

DOB: 10/14/1992                                                          ID# 00578-138

Chief Complaint: "I am fine. I just want a laptop."

Interval History: D: This writer met with pt in pt's in the HSU for a crisis referral made by nursing staff. It was reported by nursing staff that pt presents with bruises on his face. As previously noted, pt has a significant history of engaging in self-injury by punching himself. This writer met with pt by the cell door as pt politely refused an out of cell contact. This writer and pt continue to discuss pt's previous acts of self-injurious behavior. Pt reports that he has been engaging in self-injury when he is "bored". Pt is unable to verbalize a trigger for his self-injury however, per chart pt has reported to psychiatry that he is "angry" with himself for being incarcerated. Pt continues to report "I need my medication increased because it not helping me I want to sleep but I feel like it is getting effected by the two medications that were prescribed to me." This writer politely informed pt that she will continue to consult with psychiatry regarding pt's ongoing medication concerns. Pt appeared appreciative of this and continues to engage and be talkative in session. This writer assessed pt for safety and stability. Pt was able to answer the mental health risk assessment questions by currently denying thoughts of self-injury. This writer educated pt on the sick-slip policy and how to access mental health services in the future if needed. Pt was able to ask questions regarding the sick-slip policy and how to appropriately contact mental health services. No further issues to report at this time. Session concluded.

A: On the MSE pt presents as neat, alert, oriented, talkative and appropriate. Pt is able to answer the mental health risk assessment questions by denying thoughts of self-injury. Pt presents with an anxious mood, Pt appeared to make good eye contact with pressured speech at a rapid pace and normal volume. No delusions and/or hallucinations present during session. Pt currently denies SI/HI/SIB. Pt is currently a low to moderate risk for self-injury. Although pt presents with a positive future orientation reports say otherwise as pt's face is currently appears to be swollen from possible self-injury. Pt will continue to be closely monitored by staff.

P: This writer continues to consult with security staff, the shift commander, and the HSA. Will follow-up with pt per treatment plan protocol. Pt will be seen by psychiatry every 4-6 weeks for medication maintenance. Pt will also be seen by psychiatry today to assess pt's current presentation. Pt is aware on how to access mental health services if needed.

| Psych ROS: | Psychotic | Manic | Depressed | PTSD |  |
|---|---|---|---|---|---|
|  | OCD | GAD |  |  |  |
| Somatic: | Sleep | Energy | Appetite | Interest |  |
|  |  | Pain | Weak | Memory |  |
| Examination: | | | | | |
| Appearance: Neat | | | | | |
| Motor: Hyperactive | | | | | |
| Speech/Language: Pressured speech at a rapid pace, and normal volume | | | | | |

413, Mental Health Services and Suicide Prevention

Appendix E

## Donald W. Wyatt Detention Facility

## Health Services Unit/ Mental Health Progress Note

Name: Lin, Ryan

Date: 06/13/2018

DOB: 10/14/1992

ID# 00578-138

Chief Complaint: "This medication is fucking amazing!"

Interval History:  D: This writer met with pt in pt's in pt's housing unit for a (1:1) scheduled mental health appointment. This writer met with pt for an out of cell contact. Pt reports since being prescribed the medication of Zoloft he has felt "a lot better". Pt reports he is aware that he is diagnosed with Asperger's Syndrome and reports, "I know I am a little different but I think I just want to know how I can change it." This writer provided pt with support as pt discussed his social issues in the past and why it has resulted in him being terminated from several employment opportunities. Pt politely requested mental health reading material. This writer provided pt with mental health material as requested. As previously noted, pt has a significant history of engaging in self-injury by punching himself. This writer and pt continue to discuss pt's previous acts of self-injurious behavior. Pt reports that he has been engaging in self-injury when he is "bored". Pt is unable to verbalize a trigger for his self-injury however, per chart pt has reported to psychiatry that he is "angry" with himself for being incarcerated. Since last session, pt has been seen by psychiatry regarding pt's medication concerns. Pt reports, "The Zoloft is great!" Pt reports that his anxiety symptoms such as restlessness, thoughts of self-injury, isolation and loneliness have significantly decreased. This writer politely informed pt that she continue to consult with psychiatry regarding pt's ongoing medication concerns if pt expresses these medication issues in session. Pt appeared appreciative of this and continues to engage and be talkative in session. This writer assessed pt for safety and stability. Pt was able to answer the mental health risk assessment questions by currently denying thoughts of self-injury. This writer educated pt on the sick-slip policy and how to access mental health services in the future if needed. Pt was able to ask questions regarding the sick-slip policy and how to appropriately contact mental health services. No further issues to report at this time. Session concluded.

A: On the MSE pt presents as neat, alert, oriented, talkative and appropriate. Pt is able to answer the mental health risk assessment questions by denying thoughts of self-injury. Pt presents with an an appropriate mood. Pt appeared to make good eye contact with pressured speech at a rapid pace and normal volume. No delusions and/or hallucinations present during session. Pt currently denies SI/HI/SIB. Pt is currently a low to moderate risk for self-injury. Although pt presents with a positive future orientation reports say otherwise as pt's face is currently appears to be swollen from possible self-injury. Pt will continue to be closely monitored by staff.

P: This writer continues to consult with security staff, the shift commander, and the HSA. Will follow-up with pt per treatment plan protocol. Pt will be seen by psychiatry every 4-6 weeks for medication maintenance. Pt will also be seen by psychiatry today to assess pt's current presentation. Pt is aware on how to access mental health services if needed.

| Psych ROS: | Psychotic | Manic | Depressed | PTSD |
| --- | --- | --- | --- | --- |
|  | OCD | GAD |  |  |
| Somatic: | Sleep | Energy | Appetite | Interest |
|  |  | Pain | Weak | Memory |
| Examination: | | | | |
| Appearance: Neat | | | | |

413, Mental Health Services and Suicide Prevention

Appendix E

## Donald W. Wyatt Detention Facility

## Health Services Unit/ Mental Health Progress Note

Name: Lin, Ryan                                                                                     Date: 07/09/2018

DOB: 10/14/1992                                                                                     ID# 00578-138

Chief Complaint: "I think I may need another adjustment for my medication because I think I have built up a tolerance to it."

Interval History: D: This writer met with pt in pt's in pt's housing unit for a (1:1) scheduled mental health appointment in pt's assigned housing unit of K-POD. This writer met with pt for an out of cell contact. Pt reports medication issues since last session stating, "I think my meds needs to be increased because since last time I think I have built up a tolerance." This writer educated pt on the psychiatric medication pt is currently prescribed. It appears that pt is under the impression that simply taking medication will prevent pt from engaging in self-injury. Pt was encouraged to develop some new coping skills that has been discussed in several other sessions and that pt has to continue to utilize these skills and do the necessary work when out of session. Pt agreed. Pt continues to politely request mental health reading material on Asperger's. This writer provided pt with mental health material as requested, as previously noted, pt has a significant history of engaging in self-injury by punching himself. This writer and pt continue to discuss pt's previous acts of self-injurious behavior. Pt reports that he has been engaging in self-injury when he is "bored". Pt is unable to verbalize a trigger for his self-injury however, per chart pt has reported to psychiatry that he is "angry" with himself for being incarcerated. Since last session, pt has been seen by psychiatry regarding pt's medication concerns. Pt reports that his anxiety symptoms such as restlessness, thoughts of self-injury, isolation and loneliness have remained the same. This writer politely informed pt that she will continue to consult with psychiatry regarding pt's ongoing medication concerns if pt expresses these medication issues in session. Pt appeared appreciative of this and continues to engage and be talkative in session. This writer and pt continue to discuss a treatment plan regarding if pt feels that if he is going to engage in self-injury he is to speak with his housing unit officer and/or communicate with staff emergently. This writer assessed pt for safety and stability. Pt was able to answer the mental health risk assessment questions by currently denying thoughts of self-injury. This writer educated pt on the sick-slip policy and how to access mental health services in the future if needed. Pt was able to ask questions regarding the sick-slip policy and how to appropriately contact mental health services. No further issues to report at this time. Session concluded.

A: On the MSE pt presents as neat, alert, oriented, talkative and appropriate. Pt is able to answer the mental health risk assessment questions by denying thoughts of self-injury. Pt presents with an an appropriate mood. Pt appeared to make good eye contact with pressured speech at a rapid pace and normal volume. No delusions and/or hallucinations present during session. Pt currently denies SI/HI/SIB. Pt is currently a low to moderate risk for self-injury. Although pt presents with a positive future orientation reports say otherwise as pt's face is currently appears to be swollen from possible self-injury. Pt will continue to be closely monitored by staff.

P: This writer continues to consult with security staff, the shift commander, and the HSA. Will follow-up with pt per treatment plan protocol. Pt will be seen by psychiatry every 4-6 weeks for medication maintenance. Pt will also be seen by psychiatry today to assess pt's current presentation. Pt is aware on how to access mental health services if needed.

| Psych ROS: | Psychotic | Manic | Depressed | PTSD |
|---|---|---|---|---|
| | OCD | GAD | | |
| Somatic: | Sleep | Energy | Appetite | Interest |
| | | Pain | Weak | Memory |

# EXHIBIT F

*Disciplinary Reports*

Rcv 3/21/18

DONALD V. WYATT DETENTION FACILITY
DISCIPLINARY REPORT

0180-31-6097

**Report No.**

**PART I. REPORT**

| DETAINEE NAME | BOOKING NUMBER | DATE & TIME OF INCIDENT | PLACE OF INCIDENT |
|---|---|---|---|
| Lin, Ryan | 2026707 | 3/15/2018 / 3:30pm | J1-21 |

| HOUSING UNIT | DISCIPLINARY OFFENSE(S) CHARGED | OFFENSE CODE(S) |
|---|---|---|
| J1-Pod | Refusing a direct order, Refusing to stand for count | C-7, C-15 |

**SUMMARY OF INCIDENT**

On Thursday, March 15, 2018, I, Officer Murphy was posted in J1-Pod as the Housing Unit Officer (117) for second shift (3PM-11PM). At approximately 3:15PM, I announced count time in the unit and began the 3PM Bed Book, Double, Standup Count. I observed Detainee Lin, Ryan SID#00578-138 sitting inside the cell. I knocked on the window and stated "Count Time". Detainee Lin refused to stand and questioned why I wanted him to stand for count. I then gave a direct order for him to stand for count and if he refused he will be issued a ticket. He again refused, so I continued on with counting the rest of the unit. After I had finished counting the rest of the unit I went back to his cell and Detainee Lin said "Do you want me to stand now". I said yes and he complied. At approximately 6:30PM, I announced count time in the unit and began the 6:30PM Bed Book, Double, Standup Count. Again when I approached cell J1-21, I observed Detainee Lin, Ryan SID#00578-138 sitting on the seat inside the cell. I knocked on the window and stated "Count Time". Again, Detainee Lin stayed seated and began to question why he needed to stand for count. I then gave him a direct order to stand for count. He continued to stay seated and refused to stand for count. I then continued on with counting the rest of the unit. Detainee Lin will be issued a disciplinary ticket for refusing a direct order and refusing to stand for count.

| SIGNATURE OF ISSUING EMPLOYEE | REPORT FILED DATE & TIME | EMPLOYEE NAME AND TITLE PRINTED |
|---|---|---|
| | 3-15-18   8:00 pm | Officer Murphy |

| REPORT SERVED BY (PRINT) BY: | DATE SERVED | TIME SERVED |
|---|---|---|
| SGT Zoffino | 3-15-2018 | 9:30 PM |

Detainee placed on Administrative Detention pending Disciplinary Hearing:   ☐ Yes   ☒ No     Current Housing Assignment: J1-2

**PART II. INFORMAL SANCTIONS**

☐ 8 HOURS EXTRA DUTY     ☐ 24 HOUR LOCKDOWN FROM:_____ TO:_____     ☐ 48 HOUR LOCKDOWN FROM:_____ TO:_____

DETAINEE CHOOSES TO WAIVE HIS/HER RIGHT TO A DISCIPLINARY HEARING AND ACCEPTS A NON DISCIPLINE INFORMAL SANCTION. DETAINEE ACKNOWLEDGES THAT AN INFORMAL SANCTION DOES NOT BECOME PART OF THEIR PERMANENT RECORD AND THEREFORE IS NOT SUBJECT TO AN APPEAL.

Detainee Signature:_____ Date_____ Supervisor Signature:_____ Date:_____

**PART III. DISCIPLINARY HEARING**

DETAINEE HAS BEEN GIVEN WRITTEN 24 HOUR NOTICE OF HEARING BY:_____ DATE & TIME  N/A     DETAINEE CHOOSES TO WAIVE THE RIGHT TO A 24 HOUR HEARING NOTICE:

SIGNATURE  DSC     3/18/18     SIGNATURE_____ DATE & TIME_____

HEARING OFFICER/COMMITTEE MEMBER #1 NAME & TITLE: DSC

IS THE DETAINEE PRESENT FOR THE HEARING:  ☒ YES  ☐ NO (IF NOT PRESENT ATTACH WAIVER/REFUSAL TO APPEAR)

STAFF MEMBER WITNESSING REFUSAL:  SIGNATURE_____ PRINT_____

DETAINEE WAS ADVISED OF HIS/HER RIGHT TO REMAIN SILENT: YOU ARE ADVISED OF YOUR RIGHT TO REMAIN SILENT AT ALL STAGES OF THE DISCIPLINARY PROCESS BUT ARE INFORMED THAT YOUR SILENCE MAY BE USED TO DRAW AN ADVERSE INFERENCE AGAINST YOU AT ANY STAGE OF THE FACILITY'S DISCIPLINARY PROCESS. YOU ARE ALSO INFORMED THAT YOUR SILENCE ALONE MAY NOT BE USED TO SUPPORT A FINDING THAT YOU HAVE COMMITTED A PROHIBITED ACT

I HAVE BEEN ADVISED OF THE ABOVE RIGHTS:_____ ON DATE/TIME: 3/21/18  1:10

STAFF ASSISTANCE REQUESTED:  ☐ YES  ☐ NO   STAFF NAME & TITLE IF REQUESTED:_____

WITNESS REQUESTED:  ☐ YES  ☐ NO   WITNESS NAME(S):_____

|  | CHARGE #1: C-7 | ☐ NOT GUILTY | ☐ GUILTY | ☒ GUILTY WITH EXPLANATION | **DETAINEE SIGNATURE:** |
|---|---|---|---|---|---|
| **DETAINEE'S PLEA:** | CHARGE #2: C-15 | ☐ NOT GUILTY | ☐ GUILTY | ☒ GUILTY WITH EXPLANATION | I acknowledge that if I plead guilty or guilty with explanation to any charge, I am waiving my right to appeal the finding of that charge. |
|  | CHARGE #3: | ☐ NOT GUILTY | ☐ GUILTY | ☐ GUILTY WITH EXPLANATION | |

SUMMARY OF TESTIMONY:  For Refusing to stand c/o Murphy was doing the count if he was sitting on my stools - and every other c/o is fine with that

HEARING OFFICER CONCLUSION: Guilty based on Ryan's own statement of the evidence and plea

| CHARGE #4: C-7 | ☐ NOT GUILTY  ☒ GUILTY | CHARGE #2: C-15 ☐ NOT GUILTY  ☒ GUILTY | CHARGE #3:_____  ☐ NOT GUILTY  ☐ GUILTY |
|---|---|---|---|
| 5 DAYS DISCIPLINARY SEGREGATION | 5 DAYS DISCIPLINARY SEGREGATION | _____ DAYS DISCIPLINARY SEGREGATION |
| 10 DAYS SUSPENDED FOR 6 MONTHS | 15 DAYS SUSPENDED FOR 6 MONTHS | _____ DAYS SUSPENDED FOR _____ MONTHS |

☐ I HAVE BEEN ADVISED OF THE FINDINGS OF THE DISCIPLINARY HEARING AND THAT I HAVE THE RIGHT TO APPEAL THESE FINDINGS IN WRITING TO THE WARDEN WITHIN A PERIOD OF FIVE DAYS. I CHOSE TO AWAIT THE RESULTS OF THE APPEAL BEFORE I ACCEPT THE SANCTIONS IMPOSED.

☒ I HAVE BEEN ADVISED OF THE FINDINGS OF THE DISCIPLINARY HEARING. I WAIVE MY RIGHT TO APPEAL AND ACCEPT THE SANCTIONS IMPOSED.

| DETAINEE SIGNATURE  DSC | DATE & TIME 3/21/18  1:15 |
|---|---|
| HEARING OFFICER SIGNATURE | Hearing Officer Print Name     DATE & TIME |

(Revised 04/24/13)     page 1 of 2

Release
3/21/18

DONALD N. WYATT DETENTION FACILITY
DISCIPLINARY REPORT

O 80-31-9099

Report No.

**PART I. REPORT**

| DETAINEE NAME: | BOOKING NUMBER | DATE & TIME OF INCIDENT | PLACE OF INCIDENT |
|---|---|---|---|
| Lin, Ryan | 2026707 | 3/16/2018 / 3:30pm | J1-21 |

| HOUSING UNIT | DISCIPLINARY OFFENSE(S) CHARGED | | OFFENSE CODE(S) |
|---|---|---|---|
| J1-Pod | Refusing a direct order, Refusing to stand for count, Insolence Toward staff | | C-7, C-15, C-18 |

SUMMARY OF INCIDENT

On Friday March 16, 2018, I, Officer Murphy was posted in J1-Pod as the Housing Unit Officer (117) for second shift (3PM-11PM). At approximately 3:15PM, I announced Count Time in the unit and began the 3PM Bed book, Double, Stand Up Count. When I got to cell 21, I observed Detainee Lin, Ryan SID#0578-138 sitting on the bench in the cell. I knocked on the window and gave a direct order to stand for count. He refused and stayed seated. I then gave another direct order to stand for count and he said "What? Are you going to give me another ticket if I dont? "I replied "yes, if you do not stand for count you will get another ticket." To which he replied "You can write me as many as you want." I said "Fine" and walked away continuing with count. As I walked away Detainee Lin yelled "Go fuck yourself. You're a fucking faggot. Did you hear what I said? I said go fuck yourself!" I finished count and contacted my supervisor.///END OF REPORT///

| SIGNATURE OF ISSUING EMPLOYEE: | REPORT FILED DATE & TIME | EMPLOYEE NAME AND TITLE PRINTED |
|---|---|---|
| [signature] | 3-16-18  9:00pm | Officer Murphy |
| REPORT SERVED (EMPLOYEE) BY: | | DATE SERVED / TIME SERVED |
| [signature] | | 3/16/18  9:30 PM |

Detainee placed on Administrative Detention pending Disciplinary Hearing:  ☑ Yes  ☐ No    Current Housing Assignment: C3-24

**PART II. INFORMAL SANCTIONS**

☐ 8 HOURS EXTRA DUTY    ☐ 24 HOUR LOCKDOWN  FROM:_____ TO:_____    ☐ 48 HOUR LOCKDOWN FROM:_____ TO:_____

DETAINEE CHOOSES TO WAIVE HIS/HER RIGHT TO A DISCIPLINARY HEARING AND ACCEPTS A NON DISCIPLINE INFORMAL SANCTION. DETAINEE ACKNOWLEDGES THAT AN INFORMAL SANCTION DOES NOT BECOME PART OF THEIR PERMANENT RECORD AND THEREFORE IS NOT SUBJECT TO AN APPEAL.

| Detainee Signature | Date: | Supervisor Signature | Date: |
|---|---|---|---|
| | | | |

**PART III. DISCIPLINARY HEARING**

| DETAINEE HAS BEEN GIVEN WRITTEN 24 HOUR NOTICE OF HEARING BY: | | DETAINEE CHOOSES TO WAIVE THE RIGHT TO A 24 HOUR HEARING NOTICE: | |
|---|---|---|---|
| SIGNATURE | DATE & TIME | SIGNATURE | DATE & TIME |
| DSc | 3/19/18 | | |

HEARING OFFICER/COMMITTEE MEMBER #1 NAME & TITLE  DSC

IS THE DETAINEE PRESENT FOR THE HEARING:  ☑ YES  ☐ NO (IF NOT PRESENT ATTACH WAIVER/REFUSAL TO APPEAR)

| STAFF MEMBER WITNESSING REFUSAL: | SIGNATURE | PRINT |
|---|---|---|

DETAINEE WAS ADVISED OF HIS/HER RIGHT TO REMAIN SILENT: YOU ARE ADVISED OF YOUR RIGHT TO REMAIN SILENT AT ALL STAGES OF THE DISCIPLINARY PROCESS BUT ARE INFORMED THAT YOUR SILENCE MAY BE USED TO DRAW AN ADVERSE INFERENCE AGAINST YOU AT ANY STAGE OF THE FACILITY'S DISCIPLINARY PROCESS. YOU ARE ALSO INFORMED THAT YOUR SILENCE ALONE MAY NOT BE USED TO SUPPORT A FINDING THAT YOU HAVE COMMITTED A PROHIBITED ACT.

I HAVE BEEN ADVISED OF THE ABOVE RIGHTS   [signature]         ON DATE/TIME: 3/21/18  110

STAFF ASSISTANCE REQUESTED:   ☐ YES  ☑ NO    STAFF NAME & TITLE IF REQUESTED: _____

WITNESS REQUESTED:   ☐ YES  ☑ NO    WITNESS NAME(S): _____

| | CHARGE #1: C-7 | ☑ NOT GUILTY | ☐ GUILTY | ☐ GUILTY WITH EXPLANATION | **DETAINEE SIGNATURE:** [signature] |
|---|---|---|---|---|---|
| **DETAINEE'S PLEA:** | CHARGE #2: C-15 | ☐ NOT GUILTY | ☐ GUILTY | ☑ GUILTY WITH EXPLANATION | I acknowledge that if I plead guilty or guilty with explanation to any charge, I am waiving my right |
| | CHARGE #3: C-18 | ☐ NOT GUILTY | ☐ GUILTY | ☑ GUILTY WITH EXPLANATION | to appeal the finding of that charge. |

SUMMARY OF TESTIMONY: I was issues with my case and my family - and this it caused me to act out Ch rely - I an sorry and it will not happen agan.

HEARING OFFICER CONCLUSION: Guilts based on prependen of the evide. and plea

| CHARGE #1: C-7 | ☐ NOT GUILTY  ☑ GUILTY | CHARGE #2: C-15 | ☐ NOT GUILTY  ☑ GUILTY | CHARGE #3: C-18 | ☐ NOT GUILTY  ☑ GUILTY |
|---|---|---|---|---|---|
| ____ DAYS DISCIPLINARY SEGREGATION | | ____ DAYS DISCIPLINARY SEGREGATION | | ____ DAYS DISCIPLINARY SEGREGATION | |
| 15 DAYS SUSPENDED FOR 6 MONTHS | | 15 DAYS SUSPENDED FOR 6 MONTHS | | 15 DAYS SUSPENDED FOR 6 MONTHS | |

☐ I HAVE BEEN ADVISED OF THE FINDINGS OF THE DISCIPLINARY HEARING AND THAT I HAVE THE RIGHT TO APPEAL THESE FINDINGS IN WRITING TO THE WARDEN WITHIN A PERIOD OF FIVE DAYS. I CHOOSE TO AWAIT THE RESULTS OF THE APPEAL BEFORE I ACCEPT THE SANCTIONS IMPOSED.

☑ I HAVE BEEN ADVISED OF THE FINDINGS OF THE DISCIPLINARY HEARING. I WAIVE MY RIGHT TO APPEAL AND ACCEPT THE SANCTIONS IMPOSED.

| DETAINEE SIGNATURE | [signature] | DATE & TIME  3/21/18  115 |
|---|---|---|
| HEARING OFFICER SIGNATURE | Hearing Officer Print Name  DSC | DATE & TIME |

(Revised 04/24/13)                                          page 1 of 2