**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | **1:18-cr-10092-WGY** |
| | ) | |
| **RYAN LIN** | ) | |

**GOVERNMENT'S**
**SENTENCING MEMORANDUM**

### I.      Introduction

Ryan Lin has been tormenting women for years.  He used his computer skills and ingenuity to turn the lives of these women, and the men around them, into waking nightmares.  By the end, he was terrorizing an entire community.  His sophisticated use of anonymizing techniques, overseas providers, and careful operational planning allowed him to avoid detection – and punishment – for far too long.  But it is now time for Lin to face the consequences of his predatory actions, and for the Court to protect the public from this dangerous defendant.  The Government seeks a term of incarceration of 210 months, the top of the range agreed to by the parties under the plea agreement.  The Government also asks the Court to order a 60-month term of supervised release, forfeiture, restitution, and the $2,500 special assessment.

### II.     Lin's Criminal Conduct

As detailed in the Presentence Investigation Report ("PSR") and the Information, Lin committed numerous crimes, stunning in their breadth and aggression, and directly victimized at least seven women and three men, as well as countless others in the Waltham, Massachusetts, community.  Both the PSR and the Information filed in this case provide details of Lin's underlying criminal conduct.

### Summary of Charged Conduct

From in or about May 2016 through October 5, 2017, Lin engaged in an extensive cyberstalking campaign targeting Jane Doe 1.[1]  (PSR ¶ 19.)  Lin became housemates with Jane Doe 1 in approximately late April 2016, after he answered an advertisement on Craigslist advertising a vacant room at a house in Watertown.  (PSR ¶ 23.)  While Jane Doe 1 was unaware that Lin was accessing her devices and accounts, her housemates and she had observed strange behavior by Lin as soon as he moved in.  (PSR ¶ 27.)  That behavior escalated during May 2016, and, as a result, on or about May 30, 2016, Jane Doe 1 left the shared house.  Id.  Lin and Jane Doe 1 never interacted in person after the brief period of time they lived together.  Id.  But Lin's online harassment of Jane Doe 1 continued and escalated until his arrest in October 2017.  The conduct included a number of different techniques and methods, which are detailed in the PSR and described in the Information.  (PSR ¶ 23-52; Information ¶ 16-45.)

Lin's campaign against Jane Doe 1 expanded to those associated with her.  Lin harassed and threatened her mother, Jane Doe 2, and engaged in similar conduct targeting her, including sending her prepubescent child pornography.  (PSR ¶ 53 - 63; Information ¶ 46-56.)  He also harassed and threatened her father, John Doe 1.  (PSR ¶ 63a – 63f; Information ¶ 57-61.)  Lin targeted Jane Doe 1's boss, Jane Doe 3, and co-workers.  (PSR ¶ 64 – 70; Information ¶ 62-68.).  He specifically targeted a co-worker that lived with her, John Doe 2.  (PSR ¶ 71-75; Information ¶ 69-73.)  And he targeted her childhood best friend, who lived out of state.  (PSR ¶ 76-78; Information ¶ 74-76.)

---

[1] Jane Doe 1 was referenced in the original charging document, and is referenced in the Defendant's brief, using the pseudonym "Jennifer Smith."  The Government's Sentencing Memorandum follows the method used in the Information, of referring to the victims as Jane Does 1-7 and John Does 1-3.

Jane Doe 1, and those associated with her, were not Lin's only victims during this time period.  At the same time he was terrorizing Jane Doe 1 and those around her, Lin was threatening Jane Doe 5, a woman who he knew from college, and sending unwanted child pornography to both her and John Doe 3, another former classmate.  (PSR ¶ 79-83; Information ¶ 77-81.)  In September 2017, shortly before Lin was arrested, he moved into another shared home in Newton, Massachusetts.  Almost immediately, he began making anonymous threats to rape and dismember two of the women who lived there, Jane Doe 6 and Jane Doe 7.  (PSR ¶ 84-87; Information ¶ 82-85.)

Lin's cyberstalking campaigns included:

- obtaining—and then widely distributing—private information from one victim, including a personal journal, medical records, private photographs, and videos of a sexual nature;

- accessing online accounts without authorization;

- creating accounts in the name of his victims and soliciting "gang bang"/rape fantasy sexual encounters at their homes and workplaces;

- posing as his victims and sending hoax threats to shoot people and detonate bombs;

- sending online threats to rape, injure, and/or kill his victims; and

- sending his victims unsolicited images of child pornography, including photos of prepubescent female children.  PSR ¶ 20.

Lin sent a number of hoax bomb threats directed at, or falsely implicating, his victims.  (PSR ¶ 88.)  He also made anonymous threats to other locations, many in and around Waltham.  Id.  By the time of his arrest, Lin had made well over a hundred anonymous bomb threats, including those listed in the Information.  (PSR ¶ 90; Information ¶ 88.)

Lin employed a number of techniques to hide his identity online, for example, by accessing the internet using a service that anonymizes IP addresses ("TOR," an acronym for "The Onion Router"); using Virtual Private Network ("VPN") services; using anonymous overseas texting services; and using foreign encrypted email providers that do not respond to United States law enforcement and/or do not maintain IP logs or other records.  (PSR ¶ 21.)

Lin willfully obstructed the administration of justice while committing the charged offenses by deleting files, encrypting records, and removing evidence from his home when he became aware of law enforcement activity – including when he was notified by electronic communications service providers that law enforcement was seeking records from Lin's accounts.  (PSR ¶ 92.)

### Post-Arrest Conduct and Diary Entries

When Lin was arrested on October 6, 2017, his phone was seized and searched pursuant to a search warrant.  (PSR ¶ 93.) Law enforcement was able to locate a number of items on the phone that showed Lin's disturbingly methodical approach to committing his crimes.  These included a file with notes including:   "EXIF bomb threats," "Impersonating [John Doe 2's initials];" "Break into Uber account;" and "Final email then stop." Id.  Another notes file included a list titled "Daily" which included:  "Build your collection;" "Dark web research;" and "Find new victims."  Id.  Further, a notes file included the following:  "Find new ways to fish [sic] for people online;" "Find a voice changer app for Mac OS;" "Find site to place anonymous phone calls;" "Explore the dark web and find new sites for drugs and pornography;" "Join a hacking forum;" and "Try to find an online therapist."   Id.

Lin's residence was also searched the day of arrest, and electronic evidence including storage media were seized from the residence and searched pursuant to a search warrant.  (PSR ¶

94.) One piece of electronic storage media contained fragments of a diary kept by Lin chronicling his activities, including detailed evidence of the criminal activity described herein.  Id.[2]

- Thursday - 11 / 24 / 2016
  Did basically nothing today. Did do a lot of research on dealing with the police though... been ruminating a lot on past incidents from Watertown and my interactions with [Jane Doe 1].

- Saturday - 12 / 17 / 2016
  Got to level 48 in World of Warcraft. Also continued to send [Jane Doe 1] harassing emails about her abortion via email-to-SMS. It's funny how she can't block those messages because each message comes from a different phone number (lol).

- Monday - 3 / 20 / 2017
  . . . Made a TorMail account and sent [Jane Doe 1's] journals and abortion photos to her family (parents), friends, roommates, and coworkers over email and MMS. I also CCd both of her Gmail accounts (including the deleted one) and her iCloud account which I currently have access to. Shortly after that, she re-activated her Facebook profile after weeks of downtime. . . .either way, whatever I did probably did have a profound impact on her this time, and I'm curious as to what the outcome and consequences will be. We shall see in the upcoming weeks :) **

- Friday - 5 / 5 / 2017
  During the morning, sent text messages to [Jane Doe 2] from an anonymous phone number. I texted her all sorts of details about her personal life (like her gas problems and special diet) and she asked what it would take to stop, and how much money I wanted. I also sent some more mass emails of [Jane Doe 1's] diary, suicide note, therapy notes, lingerie video, and naked photos to Waltham high school, JFK middle school, Brandeis, and Bentley university, literally hundreds of people at this point have seen all of her personal shit (LOL).  It was raining heavily today, lunch by myself, went home at the usual time and did nothing but sleep for the entire day. For some reason I'm really tired today and I slept today. I didn't bother [Jane Doe 1] at all during the evening like I have been consistently almost every single day for the past few days.

- Thursday - 4 / 20 / 2017
  *** THE BIG DAY ***  During the morning, I sent out [Jane Doe 1's] diary to a TON of people on her contact list. I only got one reply though, from… (after checking during the evening after getting back home from work around 5:30pm). No contact from the police at all, I think at this point they have already given up trying to contact me via phone because they know that I won't bother picking up.  No comments or anything posted to the Tumblr,

---

[2] Due to the fact that these entries were deleted by Lin and recovered from the storage media, in original form they contained computer generated extra notations, which have been deleted for clarity.

however I did see that she tried to log into her old iCloud account. I think she realizes now (after seeing all the pictures posted on the Tumblr that I probably got them from the iCloud account)... she tried to unsuccessfully log in multiple times which resulted in the account getting locked. It doesn't matter though because she cannot reset it.   *** Later in the evening, I made another Zoho account to continue sending her diary to everyone, this time from even larger email groups. I also started sending her those harassing abortion text messages again to her new phone number, this time from Zoho and 100% through TOR which makes things super safe and anonymous for me. Think I sent about 35 or so text messages, and it does not seem to be bound by a sending limit like Mail.com does. Although I cannot be completely certain. ***

- Saturday - 5 / 27 / 2017
  Made an account on CollarSpace for both [Jane Doe 1] and her mother [Jane Doe 2] and started trolling people and inviting them to cover to her house to be raped and for sex. It seems to be pretty effective. Skipped dinner with the family and spent most of my time on my computer, sadly. Didn't really get anything too productive done either.<br /><br />** Checked the Waltham PD blotter/arrest log and saw that the police did act on my tip from a few days ago, and they are also now consistently patrolling [Jane Doe 1's] house because of the threats I made. I also started texting death threats to [Jane Doe 3] and [Jane Doe 1's stepfather]. They were made on TextNow through TOR on a VPN though, so I am not worried about getting caught. **

- Sunday - 5 / 28 / 2017
  Spent almost the entire day on CollarSpace inviting men over to [Jane Doe 1's] house. It's pretty effective but it's taking way too much of my time, so in the end I think I'm just going to troll CS casually but spend most of my time (a lot less time than I currently am) on PinkCupid getting nudes from women, and making ads on Craigslist, Backpage and other similar sites. That will probably be the easiest way to drive men to her house while minimizing the amount of time that I spend. . . Also did some more research tonight and found that there are a lot more people than I thought who changed their phone numbers: [Jane Doe 1, Jane Doe 2, and other associated family members and co-workers].  At least 10 phone number changes, easily hundreds of dollars in financial losses just from phone number changes, all because of me (LOL). Hopefully I won't have to end up paying for all of that.

- Wednesday - 7 / 26 / 2017
  During the morning and afternoon, sent out a bunch of bomb threats to the following places through TextNow over TOR by placing tips to various targets on the 847411 tipline: Somerville - Twin City Plaza/Cambridge - Cambridgeside Galleria/Waltham - Colonial Shopping Mall (85 River St)/Watertown - Watertown Mall (gun)/Waltham - 1070 Lexington St, 1265 Main St, 55 Russel St.  I managed to get at least the Twin City Plaza in Somerville evacuated as well as a large police presence at the Cambridgeside Galleria. I'm not too sure about the rest though.

- Wednesday - 8 / 9 / 2017
  Installed POF and some dating apps and tried to meet new people, found some new

interesting people like some person named Julie, got her number, might meet up with her this weekend to do something. Started stalking [Jane Doe 5] by taking pictures from her Facebook and sending her anonymous emails (over GuerillaMail and AnonEmail, over TOR network) with them and saying how I wanted to rape her. She doesn't know it's me, and as long as I do not mention anything about […], or try to interact with her on FB, she will not know it's me. Also started harassing [Jane Doe 4] as well, she finally replied saying "who is this" and "stop texting me." I'm definitely not going to stop though, haha. ** Also started impersonating [Jane Doe 2 and John Doe 1] through Cock Email by creating email accounts under their names and using it to send harassing emails as them to groups of people like car dealerships, the NIH, and schools. It is very entertaining indeed! **

(PSR ¶ 94.)

### Conduct While Incarcerated

As set forth in the PSR, Lin's conduct while he has been incarcerated at Wyatt Detention Center is disturbing. (PSR ¶ 101a – 101e.) On March 3, 2018, Wyatt Detention Center Officers searched Lin's cell, after reports from other inmates that Lin was attempting to hack into the computers in the Law Library. (PSR ¶ 101a.) An Officer then conducted a search of Lin's materials and located a series of papers showing how to use VPN, TOR, and other anonymizing services to evade law enforcement and to access "CP" (presumably short for "child pornography"). Id. In August 2018, the U.S. Attorney's Office received information directly from a detainee at Wyatt Detention Facility who had spoken with Lin. (PSR ¶ 101b.) According to the detainee, Lin: (1.) provided details about his offenses; (2.) said that he was disappointed at the level of publicity received from his bomb threats, and explained that he had thus resolved to actually create a bomb and cause an explosion so he was studying chemistry and mathematics; (3) stated that he specifically planned to bomb both the federal courthouse in Worcester, where his detention hearing was held, and the courthouse in Boston; (4) explained that he plans to kill the two female prosecutors in his case, whom he referred to by name, and then flee to the Dominican Republic, and discussed alternative plans to lure/kill the prosecutors, Jane Doe 1, and

two specific prison guards in the Dominican Republic.  (PSR ¶ 101b – 101c.)  In addition, the

detainee reported that Lin stated that he was engaged in apparent self-harm in an attempt to

obtain the attention of prison psychiatrists and in turn provide his defense attorney with an

argument regarding his mental health to use at sentencing.  (PSR ¶ 101d.)  Subsequently, papers

were uncovered from Lin's prison cell that corroborated some of the information provided by the

inmate, including chemistry calculations, an analysis of countries to live in (including the

Dominican Republic), and a chart regarding luring victims.  (PSR ¶ 101e.)

### *Lin's Widespread and Devastating Victim Injuries*

Lin severely traumatized his victims and left many emotionally devastated.  (PSR ¶ 95.)

Many suspected Lin but were not certain who their stalker was, why he had targeted them, how

he had found them, or how he knew so much detailed personal information about them.  Id.

Their reputations, both professional and personal, were at risk.  Id.  Their relationships with their

friends, family, co-workers and communities were also in peril. Id.  Many also feared for their

physical safety and/or for the physical safety of their housemates, co-workers, and other family

members. Id.  For those who received direct threats themselves, they believed that their unknown

stalker was nearby and would attack or sexually assault them at any moment.  Id.  Many suffered

resulting physical and behavioral impacts.  Id.  Several reported being extremely depressed,

unable to work or sleep, and afraid to be left home alone.  Id.

Jane Doe 1 in particular feared for her personal relationships, her relationships with her

co-workers, friends, and family members, and her ties to her community.  (PSR ¶ 96.)  Already

at an especially vulnerable time in her life and struggling with mental health issues, she had to

show up at work every day, at her auto mechanic, at her local library, in her shared group home,

knowing that her sexually explicit photographs and intensely private information had been distributed widely.   Id.  Jane Doe 1 also seriously feared for her physical safety.  Id.

Jane Doe 1's parents also suffered acutely. (PSR ¶ 97.)  Her father, John Doe 1, a surgeon, not only feared for his daughter's emotional well-being and safety but feared for his own safety and the safety of his wife and younger children, his patients, and his work colleagues at the hospital.  Id.  As noted during his interview, after receiving Lin's threatening communications, John Doe 1 acquired two firearms for protection and added security cameras and a home alarm system to his residence.  Id.  He notified his supervisors at the hospital, as well as the head of security.  This in turn prompted a lockdown drill and increased security at the hospital.  Id. Lin further harmed John Doe 1's personal and professional reputation by posing as John Doe 1 and sending Jane Doe 1's photos and diary entries, along with defamatory accusations that her father had sexually molested his daughter, to his work colleagues, neighbors, former medical school classmates, and family members.  Id.

Jane Doe's mother, Jane Doe 2, a government research scientist, suffered similar injuries. (PSR ¶ 98.)  She feared not only for her daughter's mental health and physical safety but also for her own safety, as well as the safety of her husband and step-children.  Id.  Lin harmed Jane Doe 2's personal and professional reputation by sending Jane Doe 1's photos and diary entries, along with defamatory accusations that she had sexually molested her daughter and had severe mental disorders, to her work colleagues, former medical school classmates, neighbors, and family members.  Id.  Lin also made her look like she had threatened to kill students at a nearby school.  Id.  And Lin sent her, unsolicited, multiple highly disturbing photographs of prepubescent and sadistic child pornography.  Id.

Lin's most recent housemates in Newton also suffered significant emotional injury. (PSR ¶ 100.)  One moved out of the shared house after Lin, posing as their landlord, sent her rape threats, laced with detailed personal information about her.  Id.  Fearing that she might actually be raped by her landlord or someone else, she moved back to New York to live with her parents, and, as a result, she then had to commute to her job and graduate school in Boston.  Id.  Not surprisingly, her work and schooling suffered, as did her emotional well-being.  Id.

Furthermore, Lin, through his bomb threat campaign, wreaked havoc on the town of Waltham.  (PSR ¶ 101.)  Through his onslaught of school-focused hoax bomb threats, Lin terrorized countless students (ranging from toddlers at daycare centers to college students at universities), along with their teachers and parents, as their schools were repeatedly evacuated and/or placed in lockdown.  Id.  Lin not only frightened Waltham citizens, he seriously disrupted important services.  Id.  Responding to more than 20 bomb threats in one day seriously taxed the Waltham police department and school system.  Id.

## III.   Lin's U.S. Sentencing Guidelines Calculation

As outlined in the plea agreement, the Government arrived at the same adjusted offense level as the Probation Department in the PSR, with a total adjusted offense level at 35 (PSR ¶195, 244).  This provides for a 168-210-month prison term, plus a 24-month mandatory minimum consecutive sentence for Count 25, which is the aggravated identity theft count charging Lin with violating 18 U.S.C. § 1028A.  The Government thus ultimately agrees with the PSR that Lin's total Guideline's imprisonment range is 192 to 234 months.  (PSR ¶244).  The Government's recommended sentence of 210 months is thus within the guidelines range.

However, although the Government agrees with the PSR's final number, the Government arrives at it in a different way.  Probation did not apply a three-level reduction for acceptance of

responsibility but it did not apply a four-level upward adjustment for sadistic or masochistic images. As a result, Probation also added an additional one-level in its grouping analysis. In contrast, per the plea agreement, the Government agreed to a three-level reduction for acceptance, but believes that a four-level upward adjustment for sadistic/masochistic/violent images is appropriate. Under the Government's calculation, there is no additional level added under the grouping analysis. Thus, the total adjusted offense level is also 35.

### *Adjustment for Sadistic/Masochistic/Violent Images as Applied to Child Pornography USSG Calculation (Group 1)*

A four-level adjustment for distribution of images portraying "sadistic or masochistic conduct or other depictions of violence" pursuant to USSG § 2G2.2(b)(4)(A) is appropriate. One of the images that Lin distributed to Jane Doe 2, Jane Doe 1's mother, portrays a prepubescent female, under the age of 12, sitting on a toilet, facing the camera, naked, with her legs spread apart, and with a yellow painted wooden pencil inserted partway into her vagina. In the PSR, Probation did not apply this adjustment and noted the disagreement between the parties.

The First Circuit, acknowledging that the Guidelines do not define the terms in 2G2.2(b)(4)(A), has looked to the Webster's Third New International Dictionary in defining sadism to include "the satisfaction of outwardly directed destructive impulses as a source of libidinal gratification," "a delight in physical or mental cruelty," or "excessive cruelty." *United States v. Hoey*, 508 F.3d 687, 691 (1st Cr. 2007). It also includes "the infliction of pain upon a love object as a means of obtaining sexual release." *Id.* Thus, a "sadistic" image can be one that depicts degrading, humiliating, and cruel conduct, even without depicting the infliction physical pain. *Accord United States v. Johnson*, 784 F.3d 1070, 1075 (7th Cir. 2015) (citing *United States v. Turchen*, 187 F.3d 635, 739 (7th Cir. 1999) and noting that "sadistic and masochistic conduct includes 'sexual gratification which is purposefully degrading and

humiliating' and that 'violence is not necessarily found in such conduct.").  As one court explained, "sadistic perversion involves 'gratification . . . obtained through cruelty' and masochism is 'abnormal sexual passion in which one finds pleasure in . . . being abused or dominated," and "sadisim and masochism do not require the kind of violence 'we normally consider' as violence."  *Turchen*, 187 F.3d at 739 (holding that an image of a girl being urinated on qualifies for the four-level adjustment).  Notably, in determining whether an image portrays conduct that is "sadistic or masochistic" or violent, courts examine, among other factors, the age of the victim.  *United States v. Lyckman*, 235 F.3d 234 (5th Cir. 2000) (citing other circuits).

Here there are several independent bases that support the conclusion that the image in question portrays "sadistic or masochistic conduct or other depictions of violence" under 2G2.2(b)(4).  Like urinating on a girl, forcing a prepubescent girl to sit naked on a toilet, facing the camera, with her legs spread open and a pencil inserted into her vagina, is, at its core, a depiction of "physical or mental cruelty," not to mention conduct that is humiliating and degrading.

Moreover, as a separate basis for applying the four-level adjustment, the conduct portrayed in the photo is likely to cause pain to the prepubescent female victim.  Pencils are, on average, about 20 centimeters in length, where the average child's vaginal cavity is a mere 5-8 centimeters deep.  Moreover, a pencil is made of wood, is coated in paint, and presumably contains graphite within it.  One end is typically sharpened into a point and the other contains metal and a rubber eraser.  (It is unclear from the image which end of the pencil was inserted.)  Foreign objects like pencils are capable of inflicting pain, not to mention causing infection and inflammation, when inserted into an adult female's vagina, let alone into a prepubescent female's

vagina.  Even if the girl, who appears to be 10 or 11 and has not yet reached puberty, were a few

years older, the image would still trigger the adjustment.

The fact that the pencil is only partially inserted into the girl's vagina in no way detracts

from the analysis.  First, in the image at issue, only a small portion of the pencil is visible,

suggesting a large portion has been inserted.  Second, the First Circuit has explained that an

image that depicts an anticipated penetration, but not the "consummation of actual penetration,"

can nevertheless be sadistic.  The Court reasoned that a photograph "intended to give the viewer

pleasure based on the child's actual or anticipated pain" is a sadistic image.  *Hoey*, 508 F.3d at

691.  The image need not portray sadistic conduct that actually occurred.  Further, while it is not

legally controlling, the Government notes that the facial expression of the girl is, at best,

ambiguous with regard to pain.[3]

Other courts have held that photographs involving foreign objects being inserted into

young children trigger the four-level adjustment.  *See, e.g.*, *United States v. Johnson*, 784 F.3d

1070, 1075 (7th Cir. 2015) (citing *Hoey*, 508 F.3d at 691) (holding that images involving a girl

inserting a highlighter and a handle of a screwdriver into her vagina were sadistic, because it

connoted a degree of potential violence, as an object ordinarily used to apply force with a sharp

point).   As the Court noted in *Johnson*, other circuits have "recognized that images depicting

insertion of a foreign object into a minor's genital are likely to be sadistic or masochistic in

nature."  *Id.* at 1075 (citing *United States v. Starr*, 533 F.3d 985 (8th Cir. 2008).

Likewise, in *United States v. Parker*, the court found that a young girl inserting a large

carrot into her own vagina triggered the four-level adjustment even if the harm was self-inflicted

---

[3] The Government strongly objects to the Defendant's offensive characterization of the child's
expression as "bored."

and there was no evidence of pain.  *United States v. Parker*, 267 F.3d 839, 847 (8th Cir. 2001).

The *Parker* court focused on the fact that young girls do not regularly of their own volition

choose to insert objects into their own vagina, which means the image implies the suggestion or

coercion of a third party, which contributes to its violent appeal to a sadistic audience.  The

Court reasoned, "given the plain meaning of 'violence,'" it is difficult to image that the sexual

penetration with a foreign object of a minor female would not qualify as 'violence' even if self-

inflicted."  *Id.* at 847.

In arguably analogous contexts, other circuits have held that bondage of young children

are sadistic within the meaning of the guidelines, even without a showing of any sexual activity

beyond the restraining of a child and even though the victim did not appear to be in pain.  *See*,

*e.g., United States v. Lee*, 321 Fed.Appx. 298, 301 (4th Cir. 2009) (holding that an image of a

boy "wearing a leather strap around his torso and holding his hands behind his back" was sadistic

even though the image simply implied that the boys' hands were tied, given their unusual

placement, and included no further sexual activity).

Here, like the penis in *Hoey* and the screwdriver in *Johnson*, a pencil inserted into a

child's vaginal cavity connotes potential violence.  Like the carrot in *Parker*, it also connotes

coercion by a third party, because a prepubescent girl typically would not, of her own volition,

insert a pencil into her vagina.  Moreover, like the bondage image in *Lee* and other cases, the

image here qualifies as sadistic even without a showing that the victim is in pain.

### Adjustment for Special Skill As Applied to All USSG Calculations

A two-level adjust under U.S.S.G. §3B1.3 is appropriate because Lin used a special skill

in connection with all of his offense conduct.  Section 3B1.3 provides for a two-level adjustment

if the defendant used a special skill in a manner that "significantly facilitated the commission or concealment of the offense." U.S.S.G. §3B1.3.

Here, Lin began computer programming in grade school, has a degree in computer science from a prestigious university, and spent several years working for various technology companies as a computer programmer. Lin's offense conduct was virtually entirely online, and he employed his extensive technical skills to both commit and conceal his crimes, including cyberstalking, sending hoax threats, computer hacking, identity theft, and distributing child pornography. He was incredibly effective at doing both. In the end, Lin, using his sophisticated computer skills, was able to commit, and then conceal, a wide spectrum of crimes, targeting an ever-expanding group of individuals and institutions. Lin admitted as much in his plea agreement. He specifically agreed that the special skill enhancement applied to the lead child pornography charges. (Plea Agreement ¶4.) (The plea agreement set forth Lin's potential Guidelines for the child pornography charges, which carry the highest Guidelines, but did not set forth similar Guideline's calculations for the other offenses with considerably lower Guidelines). The PSR also applied the special skill enhancement to Lin's child pornography offenses.

The special skill adjustment should apply to Lin's other offense conduct as well. Lin used his special skill across the full panoply of his criminal conduct. He did not save it just for committing child pornography crimes. In any case, Lin was well aware that, if law enforcement could tie him to sending child pornography to Jane Doe 1's mother, her childhood friend, and her boss, that would also help law enforcement tie him to sending the hoax bomb threats to the Waltham schools and other institutions in her community, as well as the other crimes he committed.

As set forth in Lin's diary and as uncovered in the investigation, Lin was able to take great care to commit and then hide his criminal conduct, including using encrypted overseas internet providers, using TOR, destroying logs, using encryption on his devices, carefully researching which VPN providers to use to hide his IP address, based on which ones kept logs and for how long, and using anonymous tip lines of various police departments to send in his hoax threats.  (PSR ¶ 90b.)  He not only used VPNs, overseas encrypted email providers, and anonymous tip lines, but he took care to use TOR to connect to the VPN services, the overseas email providers, and the tip lines, carefully adding additional layers of anonymity.   Id.   In his diary, Lin stated that he "converted everything over from Truecrypt to Veracrypt, and set up VC on my Macbook.  Also moved a much of documents from Dropbox to Storage VC volume (in case search warrant is executed)."  (3/9/17 entry).  Id.  He stated that he was "no longer going to be using timeline to record my daily log anymore . . . instead . . . recording everything inside this notepad until I find a way to properly secure the timeline," that he "deleted all copies of the VC [veracrypt] volumes and incriminating programs off my Macbook in case it is seized due to a search warrant," "For the same reason I am also keeping my desktop at home [in New York with his parents] . . . if those get confiscated . . . (3/24/17 entry).  Id.  In connection with his hoax bomb threats in particular, Lin carefully tracked whether webserver logs from "Waltham Schools, Bentley, Brandeis, . . .might end up giving me away, because I used [VPN provider] to visit all of them.  Hopefully [VPN provider] does not keep connection logs for too long."  (5/30/17 entry.)  Id.  He devised a list of "arguments for if I do get caught based on the web server logs."  Id.

Lin bragged about his prowess on Twitter as well, advising others about how to access the internet anonymously and evade detection.  He warned, "There is no such thing as VPN that

doesn't keep logs," and offered detailed evaluations of which VPN services were most effective.

The investigation confirmed that Lin employed these various techniques.  (PSR ¶ 90d.)  He used

TOR to connect to VPNs and overseas providers, he encrypted his hard drives, he used over

1,000 different IP addresses in connection with his criminal conduct, he used hundreds of

separate accounts with well-known overseas encrypted e-mail providers, he used dozens of

spoofed text providers, and multiple VPN services. Id.  For the bomb threats in particular, when

placing the threats, Lin used TOR and VPNs to then connect to the anonymous online tip lines,

knowing that they were not logging his IP addresses.  Id.  He alternatively used well-known

overseas e-mail providers that do not log and do not respond to law enforcement.  Id.

Ultimately, Lin used his special skill to commit and conceal his involvement in all of

various types of criminal conduct—sending child pornography, hacking into online accounts,

sending hoax bomb threats, and related conduct.

### *Adjustment for Vulnerable Victim as Applied to Cyberstalking USSG Calculation (Group 3)*

The Government agrees with the PSR that a two-level adjust under U.S.S.G. §3A1.1 is

appropriate because Lin targeted a vulnerable victim.  USSG § 3A1.1(b)(1) provides for a two-

level adjustment "if the defendant knew or should have known that a victim of the offense was a

vulnerable victim."   The commentary defines "vulnerable victim" to include someone who is

"unusually vulnerable due to . . . mental condition or who is otherwise particularly susceptible to

the criminal conduct." Commentary, Application Note 2(B).

As Lin learned within weeks of meeting Jane Doe 1, she was coping with a recent

abortion, had a history of, and was taking medication for, depression and other mental illnesses,

had attempted suicide several times in the past, and had no family in Massachusetts.  Jane Doe

1's fragile emotional state, coupled with the leverage Lin exerted over her with her private

information and photographs, diminished her capacity to prevent Lin's cyber assaults. Furthermore, it provided ammunition for his continued pattern of abuse.

The "unusually vulnerable victim" enhancement can apply even when the defendant learned about the vulnerability after the inception of the crime and did not specifically target the victim because of the vulnerability. *United States v. Gill*, 99 F.3d 484, 487 (1st Cir. 1996). *Accord U.S. v. Pol-Flores*, F.3d 1 (1st Cir. 2011), *United States v. Urbina-Robles*, 817 F.3d 838 (1st Cir. 2016).  Lin hacked into Jane Doe 1's computer, which is where he learned about Jane Doe 1's personal strife and mental health issues and stole copies of her diary, medical records, and sexually explicit photographs. He not only proceeded in spite of this knowledge, but used it to his benefit and her detriment.

### Comparison of Lin's USSG Without Child Pornography Offenses

Ultimately, as part of its plea agreement with Lin, the Government agreed to recommend a sentence of not more than 17.5 years (210 months), which is within the 192-234 Guidelines range as computed by both the Government and the PSR.  (PSR ¶244).   The child pornography offenses have a significant impact on the guidelines.   But beyond these offenses – which are serious in their own right – Lin essentially committed three other sets of crimes:   computer hacking, cyberstalking, and hoax bomb threats.   Each of these sets of crimes, standing alone, would be serious on their own.   Lin's cyberstalking alone would make his Guidelines a level 31[4], which, with acceptance and after the 2-year mandatory minimum, would support a term of incarceration of 8.5-10-years.   Lin's hoax bomb threats conduct alone would make his Guidelines a level 27[5], which, with acceptance and after the 2-year mandatory minimum, would

---

[4] The USSG for cyberstalking Jane Doe 1 alone is a level 26 (PSR ¶131) + 5 levels for the other victims' ungrouped conduct.
[5] The USSG for sending hoax bomb threats to the Waltham Government Center alone is 22 (Adjusted PSR ¶ 114) + 5 levels for the other victims' ungrouped conduct.

support a term of incarceration of 6.25-7.25 years.  Finally, Lin's computer hacking alone would

make his Guidelines a level 14, when applying the vulnerable victim enhancement, which, with

acceptance and after the 2-year mandatory minimum, would support a term of incarceration of

approximately 3 years.   Lin's criminal conduct encompassed all of these crimes, and when

viewed as a whole, supports a term of incarceration of 210 months.

### Lin's Mental Health Issues

Lin claims that he suffers from Autism Spectrum Disorder (ASD) and argues that an 84-

month sentence is warranted under the § 3553(a) factors.[6]   The government is mindful that Lin

may well have some recently diagnosed mental health issues; however, as set forth below, Lin's

mental health issues provide additional support for the Government's recommended within-

Guideline's 210-month sentence.

### Mendoza's Report

Lin submitted a post-arrest psychological evaluation conducted by a non-treating forensic

psychologist, Robert Mendoza, Psy.D.  Mendoza opined that Lin has ASD, between level 1 and

2, with no intellectual impairment.  (Mendoza 2/22/18 report, p. 9).  He stated that there is "no

indication of intellectual disability or other neurodevelopmental or other psychiatric disorders

that might better explain" Lin's symptoms and that Lin's "obsessive and compulsive behaviors

---

[6] Lin is not arguing for a downward departure for diminished capacity under USSG § 5K2.12.
He is not eligible for a below-guidelines departure because he was convicted of an offense under
chapter 108A, 110.  Nor does Lin rely on § 5H1.3.  This is because any mental illness that Lin
may suffer from is not present to the "unusual degree" that distinguishes this case from the
typical cases covered by the guidelines.  The First Circuit has held that "departures based upon a
defendant's mental condition are discouraged" and that the sentencing court must first make a
finding that the mental condition is "extraordinary or atypical."  *United States v. Maldonado-
Montalvo*, 356 F.3d 65, 74 (1st Cir. 2003).

appear to be most likely related to the diagnosis of [ASD]."  (Report, p. 9-10.)  Mendoza

concluded that Lin has social impairments, inflexibility, difficulty with change, and hyper-focus

on computer science.  In his view, Lin unsuccessfully used computers to help him engage

socially with others, which in turn led to "an inappropriate use of computers and an inability to

understand the full consequences of his social and emotional inadequacies on others." (Mendoza

Report p. 12).

Curiously, despite the anti-social nature of Lin's criminal conduct and the child

pornography component, Mendoza apparently did not perform standard evaluations of Lin for

sociopathy, psychopathy, or other personality disorders.  Nor did he conduct a psycho-

sexual/sex-offender evaluation.[7]  Furthermore, he did not review significant materials available

in the case.

In any case, ultimately, Mendoza did not conclude that Lin has any cognitive impairment.

Nor did he conclude that Lin did not understand that his behavior was illegal and wrong.  To the

contrary, Mendoza opined that Lin "recognized that there could be direct consequences . . .

including involvement with law enforcement."  (Report, p. 11.)  He offered no opinion about

Lin's potential dangerousness or likelihood of recidivism.  Mendoza likewise offered no opinion

regarding an appropriate sentence for Lin.

---

[7] Lin only produced Mendoza's final February 2018 report without the raw data, such as the
underlying tests, Lin's actual responses, or other materials he relied on. There is no indication
that Mendoza administered the Abel Assessment of Sexual Interest or the Hare Psychopathy
Checklist, which are common diagnostic tools.

### *Lin's Mental Health Issues Do Not Support A Downward Variance*

It is undisputed that before Lin's post-arrest diagnosis, Lin had not been formally diagnosed with autism or any other mental health disorder. It should also be undisputed that Lin is highly functioning, sophisticated, and clearly understood that his conduct was illegal. Lin graduated magna cum laude in 2015 with a computer science degree from a prestigious university, Rensselaer Polytechnic Institute. Lin then lived independently in Massachusetts and California, while his family was in New York, where he was employed full time at various times as a computer programmer with several companies. Lin is quite sophisticated. As his diary entries make clear, Lin knew the difference between right and wrong and was fully aware that he was, and indeed derived pleasure from, hurting other people, many of whom were complete strangers. Lin also knew that he was committing serious crimes and facing significant imprisonment. In response, he used sophisticated techniques to hide his identity from his victims and from law enforcement.

Rather, whatever mental health issues Lin may have, make him more, not less, dangerous and likely to recidivate. As set forth in Mendoza's report, Lin has a demonstrated history of low impulse control, obsessive behavior, and a lack of empathy. These are the very drivers behind compulsive and predatory cyberstalking. As demonstrated by his diary, Lin delighted in seriously injuring his victims' mental health and also putting them in significant real world danger.

Ultimately, sentencing Lin to less time in prison will not adequately deter Lin and others, protect the public, respond to needs for just punishment, or promote respect for the law. Courts in arguably analogous contexts have refused to depart or vary downward due to the defendant's

autism. *See, e.g., United States v. Dolehide*, 2011 U.S. Dist. LEXIS 49859 (N.D. Iowa 2011), aff'd, 663 F.3d 348 (8th Cir. 2011) (refusing to grant a downward departure or variance in child pornography prosecution of autistic defendant, concluding that "[w]hile Defendant may or may not be accurately diagnosed with Asperger's Syndrome (at least a mild case thereof), the evidence is clear that Defendant is not suffering from a significantly reduced mental capacity. There is no credible evidence that Defendant's mental health condition contributed in a significant way to his offense of conviction, or forms a basis for a variance. *See generally, United States v. Lange*, 445 F.3d 983 (7th Cir. 2006)(affirming district court's refusal to grant downward departure for diminished capacity in child pornography prosecution of possible mildly autistic defendant, reasoning that he suffered from no cognitive impairment and could control himself). *Accord  United States v. Morais*, 670 F.3d 889 (8th Cir. 2012) (affirming district court's refusal to grant downward departure or variance in child pornography prosecution of autistic defendant); *United States v. Jones*, 563 F.3d 725, 728 (4th Cir. 2017) (refusing to overturn the lower court's decision to decline downward departure in a child pornography prosecution involving a defendant with Asperger's Syndrome who was "well educated [and] had a good employment history, lived on his own, and held a driver's license").

### The 3553 Factors Support a 210-Month Sentence

There are several aspects of Lin's cyberstalking campaigns that were especially pernicious, including: (1) its duration and persistence, continuing while he knew that law enforcement was investigating him and in violation of orders of protection against him; (2) the number of his victims; (3) the multiple vectors Lin used to launch his attacks—hacking, swatting, doxing, sending threats, sending unsolicited child pornography; (4) the skill he used to evade law enforcement; and (5) the significant and widespread harm he caused.

Lin has a long and demonstrated history of, without provocation, stalking, harassing, and hacking people he has come into contact with---whether classmates in college, roommates, or friends and family associated with those roommates.  He did so even knowing that Waltham Police and other local law enforcement were investigating him.

Lin continued to engage in these crimes over the course of several years, across multiple vectors, and targeting dozens of individuals and institutions.  Lin went to extraordinary lengths to try to hide his identity, using hidden devices, anonymous tip-lines, encrypted overseas e-mail providers, TOR, and spoofed accounts. The nature and circumstances of his conduct clearly warrant a lengthy term of incarceration.

Furthermore, a 210-month sentence is needed both to protect the public from Lin, who is dangerous and out of control, and send an important deterrence message to both Lin and other would-be cyberstalkers who are contemplating similar crimes.  These cyber predators presumably already realize that, because they are hiding behind their computers, it is much less likely that they will be detected than if they committed a hands-on offense.   They may also mistakenly believe that cyberstalking is not a serious crime.  If cyber criminals realize that the punishment that is ultimately meted out is fairly mild, then there is a serious risk that they will logically conclude that there is not a significant risk to engaging in this behavior.

Moreover, a 210-month sentence is proportionate with other cases, particularly when the Court considers the sentences of Defendants who were convicted for engaging in a sub-set of the conduct that Lin committed.   *See generally*, *United States v. Sayer,* 748 F. 3d 425 (1st Cir. 2014) (affirming 60 month term of incarceration for cyberstalking of one victim); *United States v. Rubens*, 696 Fed. Appx. 941 (11th Cir. 2017) (affirming 120 month term of incarceration for cyberstalking campaign in which defendant photoshopped sexual acts of his victims and posted

them online);  *United States v. Conlan*, 786 F.3d 380 (5th Cir. 2015) (cyberstalking case of one

victim resulting in a ninety-six month term of incarceration); *United States v. Petrovic*, 701 F.3d

849 (8th Cir. 2013) (cyberstalking case of one victim resulting in a ninety-six month term of

incarceration).

IV.   **Conclusion**

A significant period of incarceration is necessary in light of the nature of Lin's offense,

including the extensive victimization of victims, both individual and institutional, and the depth

of harm he inflicted on them.  A lengthy prison sentence is also necessary to promote respect for

the law as well as to deter and protect the public from a seemingly-incorrigible defendant.  A

210-month sentence, moreover, is not greater than necessary and would not result in an

unwarranted sentencing disparity among similarly situated defendants.  It is also within the

agreed upon and seven-17.5 year binding range set forth in the Lin's plea agreement and is

within the sentencing guideline's range as calculated by the PSR.

Accordingly, the government respectfully submits that a 210-month period of incarceration is appropriate, and, for the reasons set out above, is necessary.

September 28, 2018

Respectfully submitted,

ANDREW E. LELLING
UNITED STATES ATTORNEY

By:     */s/ Mona Sedky*
        Mona Sedky
        Senior Trial Counsel
        U.S. Department of Justice
        Computer Crime & IP Section

        */s/ Amy Harman Burkart*
        Amy Harman Burkart
        Assistant U.S. Attorney

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ Amy Harman Burkart
Amy Harman Burkart
Assistant U.S. Attorney

Dated:  September 28, 2018